1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3   UNITED STATES OF AMERICA          )
                                      )
4            Plaintiff,               )    CRIMINAL ACTION FILE
    v.                                )    NO. 1:12-CR-285-WSD-2
5                                     )
    FABIAN TERRAN MURRAY (2)          )
6                                     )
             Defendants.              )
7   _____)

8   UNITED STATES OF AMERICA          )
                                      )
9            Plaintiff,               )    CRIMINAL ACTION FILE
    v.                                )    NO. 1:12-CR-286-WSD-1
10                                    )
    FABIAN TERRAN MURRAY (1)          )
11                                    )
             Defendants.              )
12  _____)

13

        TRANSCRIPT OF PROCEEDINGS - SENTENCING
14    BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
            UNITED STATES DISTRICT JUDGE
15
                Tuesday, May 12, 2015
16

17  APPEARANCES OF COUNSEL:

18  For the Plaintiff:       OFFICE OF THE U.S. ATTORNEY
                             (By:  Richard Moultrie
19                           Phyllis Clerk)

20  For the Defendant:       THE SECRET FIRM P.C
                             (By:  Akil K. Secret)
21

22

23       *Proceedings recorded by mechanical stenography*
          *and computer-aided transcript produced by*
24            NICHOLAS A. MARRONE, RMR, CRR
                    (404) 215-1486
25

1                            I N D E X

2       Speaker                                    Page

3
        Defendant Fabian Terran Murray              31
4
        Sheila Murray Isler                         47
5
        Dorothy Murray                              48
6
        Ms. Pruitt                                  59
7

8       Sentence                                    64

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    Tuesday Afternoon Session

2                         May 12, 2015

3                          2:30 p.m.

4                        -- -- --

5              P R O C E E D I N G S

6                        -- -- --

7          (In open court:)

8          THE COURT:  Good afternoon.  This is the sentencing

9    in the United States v. Fabian Terran Murray in Criminal

10   Action Nos. 12-285 and 12-286.

11         Would counsel announce their appearances, please?

12         MS. CLERK:  Good afternoon, Your Honor,

13   Phyllis Clerk on behalf of the government.  Seated with me at

14   counsel table is FBI Agent Taylor Dervish.

15         THE COURT:  Good afternoon.

16         MR. SECRET:  Akil Secret, Your Honor, on behalf of

17   Mr. Murray.  Good afternoon, Your Honor.

18         THE COURT:  Good afternoon.

19         Good afternoon, Mr. Murray.

20         DEFENDANT MURRAY:  How are you doing, sir?

21         THE COURT:  I'm fine, thank you.

22         Mr. Murray, you are probably aware that there was a

23   long document that we call the presentence report.  It has a

24   lot of background information about you and some information

25   about the guidelines and information about the facts of this

1   matter in the two cases.

2              I just wanted to make sure that you have received a

3   copy of that.  Have you?

4              DEFENDANT MURRAY:  Yes, sir.

5              THE COURT:  And have you had a chance to read it

6   and to discuss it with Mr. Secret?

7              DEFENDANT MURRAY:  Yes, sir.

8              THE COURT:  I didn't see any facts that were

9   contested in the presentence report.  I know that's separate

10  and apart from the guideline objections that you have, but

11  I didn't see any objections to the facts, but I wanted to

12  make sure I didn't miss any.

13             Are there any objections?

14             MS. CLERK:  Not from the government, Your Honor.

15             THE COURT:  All right.  Thank you.

16             MR. SECRET:  The only objections to the facts

17  I think are maybe somewhat implicit in our denial of the

18  undue influence is there Mr. Murray would deny that he used

19  any acts of violence against any of the alleged victims in

20  the case.

21             THE COURT:  All right.  And I don't know if there

22  is any evidence of acts of violence against any of the

23  victims.

24             MS. CLERK:  No, Your Honor.  The government does

25  not plan to present any in its representation about the

1    application of violence.

2         THE COURT:  All right.  So with that qualification,

3    I am going to adopt the facts that are set forth in the

4    presentence report as my findings of facts.  I will use those

5    in determining a reasonable sentence, and I will also

6    consider anything else that's presented here during the

7    hearing, as well as the information, Mr. Secret, that's been

8    delivered to me.

9         There have been some letters that I have

10   received.  I have read those.

11        MR. SECRET:  Thank you, Your Honor.

12        THE COURT:  And I have reviewed those in connection

13   with the sentencing.

14        But there are some guideline objections.  Let's

15   start with them.

16        The first is there is an objection to the

17   application of the two-point increase under specific offense

18   characteristics, undue influence, under 2G 1.3 (b) (2) (B).

19        And I have read your sentencing memoranda on that

20   and have reviewed the guideline and the application notes

21   myself, but I do want to give you an opportunity if there is

22   anything else you want to present?

23        MR. SECRET:  Your Honor, I would just say this.

24   I think that with respect to -- we have two indictments, thus

25   two enhancements.  So --

```
 1              THE COURT:  We actually have two age groups too,
 2     one to which an exemption applies and one that doesn't.
 3              MR. SECRET:  That's correct.  And I think in 285
 4     the presumption would be applicable in the case of both
 5     alleged victims.
 6              THE COURT:  Right.
 7              MR. SECRET:  And in 286 it would not be applicable
 8     I think with respect to J.B.
 9              THE COURT:  Right.  And I don't think the
10     government contests that, do they?
11              MR. SECRET:  No.
12              THE COURT:  Isn't that correct, Ms. Clerk?
13              MS. CLERK:  That's correct, Your Honor.
14              MR. SECRET:  When I look at the application itself
15     and when I look at the case law supporting it, the only
16     argument, speaking, you know, genuinely, is the credibility
17     of -- particularly in Indictment 285, is the credibility I
18     believe of it's A.C. and O.M., with respect to their
19     allegations, number one, and then, number two, is that if
20     undue influence was exercised in 285, it would have been by
21     Hill more so than Mr. Murray.
22              I think if I were to argue a factual sort of
23     progression of Mr. Murray's involvement in this activity,
24     I get the impression from 285 is it's really his baptism,
25     that he is being taught for the most part and sort of tutored
```

1    by Mr. Hill in this activity, in the use of the internet, in

2    the use of hotel rooms, and all of the -- and speaking with

3    the women and the money and dealing with the johns and so

4    forth.  That is in 285, and that is with respect to A.C. and

5    O.M., I believe.

6              And then I look at with respect to the description

7    of the evidence or the description of the events as described

8    by those two victims leaves a lot to be desired in terms of

9    their credibility.  And I'm not talking about the underlying

10   offense.  We are just talking about this enhancement.

11             I think that when they are first arrested, it's

12   very clear that their participation in -- at least to me,

13   that their participation in the events is more or less

14   voluntary, but they are crafty enough to know when

15   encountering a police officer that their best play with this

16   police officer is to demonstrate to him that they are

17   victims.

18             And, in fact, I believe there is a tape

19   recording and a video recording inside the vehicle where

20   there is some discussion between them as to how we make that

21   play, how do we do that with this police officer, how do we

22   take advantage of our age, of our position in this

23   circumstance to take advantage of this police officer's

24   sympathy for us.

25             So, I mean, those are the only two arguments that I

can make with respect to undue influence.

With respect to 286, I would only be able to raise the issue of credibility, of reliability of the testimony of J.B.

I believe that she gives two versions of this incident involving gunshots.  One version she gives, she attributes that conduct to Mr. Murray and Mr. -- is it Ready?  Or they called him Ready.

THE COURT:  Right.

MR. SECRET:  And on the other instance, she attributes -- there is a police report where she first encounters the Cobb County police where she described the person who fired shots at her -- or fired shots as the same person from whose car she jumped and escaped and incurred all these burns.

And those obviously are not two of the same people.  I think the first person when she jumped out of the vehicle was Blue, the pimp who brought her down from New York, and then the second description -- so that's the person out of whose car she jumped.

So, again, the only issue that I could raise with respect to that particular enhancement is credibility of the witness J.B.

THE COURT:  All right.  Thank you, Mr. Secret.

Ms. Clerk?

1          MS. CLERK:  Your Honor, of course, the government

2   disagrees with Mr. Secret's interpretation of the minor girls'

3   in Case No. 285, O.M. and A.C.'s credibility.

4          I don't believe that Mr. Secret has rebutted the

5   presumption that there is an undue influence enhancement

6   applicable with respect to O.M. in Case 285.

7          And if Mr. Secret is relying on the girls, A.M. --

8   excuse me, O.M. and A.C.'s credibility to establish the fact

9   that there was not undue influence, I would like to point out

10  to the Court that in the presentence report, there are

11  statements by Mr. Saintvil referencing the conduct that

12  Mr. Hill and Mr. Murray engaged in pretty much in unison.

13         Mr. Hill and Mr. Murray both went to and inside the

14  convenience store and purchased the condoms for O.M. and

15  A.C., Your Honor.  Both Mr. Hill and Mr. Murray went inside

16  the Extended Stay Hotel to register for the room where they

17  housed O.M. and A.C.

18         And according to Mr. Saintvil, Mr. Saintvil, as the

19  Court remembers, was the one that was driving O.M. and A.C.

20  around for the purpose of them engaging in commercial sex

21  acts, and that Mr. Saintvil references in Paragraph 38, page

22  eight of the presentence report, that he observed Hill and

23  Murray split the money and that each paid Saintvil twenty

24  dollars for driving.

25         So this is not just Mr. Hill having the undue

influence or engaging in the conduct where -- that A.C. and
O.M. were willing and wanting to engage in this kind of
conduct.  There is a presumption here that they exerted undue
influence.

O.M. is at least ten years younger than
Mr. Saintvil.  I don't believe that Mr. -- excuse me,
Mr. Murray.  Mr. Murray hasn't rebutted that presumption that
the undue influence enhancement applies with respect to
O.M.

I'm going to -- in addition to that, with respect
to J.B. in Case No. 286, while there is not an undue
influence presumption here, Mr. Murray at the time was nine
years older than J.B., and I think the government referenced
in our presentence report that he was just three months shy
of the ten-year age gap.

As the Court knows from the government's sentencing
memorandum, that the Court can take that nine-year age
difference into consideration in determining whether or not
he exerted undue influence over J.B.

Your Honor, like O.M., J.B. was a runaway, and that
is also a factor the Court can consider.  Because they were
underage and they were runaways, and the fact they are
runaways also make them vulnerable to be influenced by these
adult men in their lives.

In addition to the undue influence, Your Honor,

1    argument that the government made in the sentencing

2    memorandum, we discussed the fact that Mr. Murray bought

3    provocative clothing for J.B. to wear.

4          That he also, along with Mr. King, Richard King in

5    the 286 indictment, paid for housing for J.B., and that he

6    also paid Jonathan Branch to drive her around similar to the

7    conduct that occurred in the first case, 285.

8          So, Your Honor, we believe that there is sufficient

9    facts for the Court to consider in both cases that the undue

10   influence application should be applied, specifically with

11   respect to 285 because there is a presumption that undue

12   influence occurred because of the age difference between O.M.

13   and Mr. Murray.

14         Thank you.

15         THE COURT:  Mr. Secret, anything else you want to

16   add on the undue influence in response to what Ms. Clerk

17   argued?

18         MR. SECRET:  No, Your Honor.

19         THE COURT:  I have spent a lot of time with the

20   facts of these two cases as well as the other cases that I

21   have already sentenced.

22         And on the 285 case, one of the problems on cases

23   where you are dealing with very small organizations that

24   don't have much depth to them is trying to see who exerted

25   influence upon each other as participants and also on the

1   victims.

2          And the guidelines do provide under 2G 1.3 (b) (2)

3   (B) for an increase of two points where there is conduct that

4   tended to remove from the victim the voluntariness to engage

5   in sexual conduct.  And the question here is in the 285, as

6   between Murray and Hill, which of them or did both of them

7   exert undue influence.

8          I actually at one point had a chart tallying up how

9   many things were attributed to Mr. Hill and how many things

10  were attributed to Mr. Murray.  There are more Mr. Hill

11  attributions than there are Mr. Murray attributions.  And

12  with respect to that criminal conduct, I think I agreed

13  generally with Mr. Secret's view that, of the two, that

14  Mr. Hill seemed to have more managerial and organizational

15  responsibility.

16         That's not the issue in this guideline.  The issue

17  in this guideline is did Mr. Hill engage in conduct -- and

18  it's presumed that he did because of the age difference -- is

19  it -- do the facts rebut that he exerted undue influence.

20         And the way I think I have ultimately looked at

21  this is that when you have just two people like Mr. Hill and

22  Mr. Murray, and it's such a small group of people and so few

23  victims, that when one does something, there is a

24  transference of that influence to the other.

25         And while Mr. Hill was more responsible and I think

1   more active in the steps that were undertaken that put these

2   victims in the position that they were put, in my chart also

3   I noticed that whenever things happened, they were there

4   together.

5         And that's when I think that there is, when you

6   have two people that are collectively engaged in the conduct,

7   the fact that one person takes a specific step doesn't mean

8   that that wouldn't remove from the victim the voluntariness

9   or the sense that they could stop it, because it's not one

10   person, they are acting together.

11         In cases like this, it always depends upon the

12   collective facts that I have before me.  And even though if I

13   were to weigh it I would say that Hill did a little bit more,

14   I do believe that the manner in which they operated in the

15   285 case with respect to these two victims, that there is not

16   evidence to overcome the presumption.

17         And I would say even independent of the

18   presumption, that I find that there was undue influences

19   exerted by Mr. Murray, and, therefore, in the 285 case it

20   applies.

21         To me the 286 case is somewhat easier, because in

22   that case Mr. Murray was more active, and if you made a chart

23   you would find that his name is more associated with the

24   actual conduct.

25         In fact, in both of these cases, that they had

1    sexual intercourse with these young girls I think in and of

2    itself shows the authority that they were exerting over

3    them.

4            And so in both cases I find that the enhancement

5    applies.  And, therefore, I am overruling both the objection

6    to the 285 and 286 case to the application of the undue

7    influence increase.

8            So the next objection is to the role of the offense

9    under 3B 1.1 (c).  There has been -- as you know, there are

10   three applications, and most of them under the guidelines

11   apply where you have five or more participants.  There are

12   less than five participants, everybody agrees to that, in

13   both of these cases.

14           But there is, if somebody has a managing or

15   supervising role or some other leadership function, there is

16   the possibility of a two-point increase.

17           So I will hear from you on the role of the

18   offense.  It's the government's burden on this, so they can

19   begin.

20           MS. CLERK:  And, Your Honor, I agree with the

21   Court's assessment that in the 285 case, that it appears that

22   Mr. Hill had a lot more managerial and/or leadership role

23   than Mr. Murray.

24           I think that I would continue to just point out for

25   the Court that the other factors the Court can consider in

1    determining whether or not in the Case 285 that Mr. Murray

2    was an organizer or manager or a leader is the fact that

3    they -- he did claim the larger portion of the share of the

4    profits.

5              I think I just pointed out to the Court that

6    Mr. Hill and Mr. Murray received the bulk of the money from

7    the girls and that they split the money and each gave money

8    to Mr. Saintvil.

9              I also believe, Your Honor, that that --

10             THE COURT:  Well, Mr. Saintvil's role was a

11   footnote to the overall organization.  He had a limited

12   specific role.

13             In fact, if anything, his wife did more than

14   Mr. Saintvil did --

15             MS. CLERK:  That's correct, Your Honor.

16             THE COURT:  -- and she wasn't prosecuted.

17             But as between the two, they were sharing it

18   equally.  I don't see where -- that basically the

19   organization was run by Mr. Hill and Mr. Murray, although I

20   think more substantially in the 285 case under the direction

21   of Mr. Murray.

22             The question is is there enough to find that

23   Mr. Hill in the 285 case should be equally responsible, which

24   is what we are really saying, for the enhancement.

25             MS. CLERK:  That's correct, Your Honor.

1      THE COURT:  And I am having -- I'm struggling with

2  that.

3      MS. CLERK:  And I understand the Court's struggle,

4  because based on the facts it appears that Mr. Hill -- that

5  the majority of the communicating with Ms. Saintvil, he was

6  the one that I believe directed the poses and he was the one

7  who told the girls how much to charge and how to communicate

8  on the phone to clients.

9      But I would just like to point out to the Court,

10  and some of the things the Court already noted, the fact that

11  when the girls were picked up by Mr. Hill and Mr. Murray,

12  that Mr. Saintvil was left in the car with O.M. and A.C., and

13  it was Mr. Hill and Mr. Murray who went inside the store.  It

14  was Hill and Mr. Murray who went to the Extended Stay Hotel

15  and paid for the room.  It was Mr. Hill and Mr. Murray who

16  engaged in --

17      THE COURT:  Well, you know, that's the way the PSR

18  is written, but I can't believe that they are -- let's just

19  take paying for the hotel room.  I can't believe that they

20  are both up at the counter and one person is saying, well,

21  here is my money, here is my money, or here is my credit

22  card, here is my credit card, split it equally.  I just -- I

23  don't believe that's what happened.

24      I think that the inference is that when the PSR

25  says that they were there together, I believe Mr. Murray was

1    there, but I believe that the most reasonable inference is

2    that even with respect to those things, that Mr. Hill was the

3    moving force behind that.

4         MS. CLERK:  I agree with that, Your Honor.

5         I just wanted to point out one final thing for the

6    Court with respect to this enhancement in reference to case

7    285, that there is evidence that Mr. Hill and Mr. Murray

8    received the larger portion of the share of the money, and

9    that they were the ones who each paid Mr. Saintvil money, and

10   that's a factor for the Court to consider in terms of whether

11   he was a leader and/or organizer or co-leader with respect to

12   Case No. 285.

13        With respect to 286 --

14        THE COURT:  And let me just -- because you know

15   this and Mr. Secret knows this, but the purpose of the role

16   enhancement is to differentiate between relative culpability

17   for people in an organization.  It's really hard to do that

18   when you basically have got three people and Ms. Saintvil who

19   is a person but is not really -- hasn't been charged.

20        So you have -- and with respect to those three

21   people, there is really two sets of people; that is, the

22   Hill and Murray group and Saintvil group.  And I am

23   convinced, at least, having listened to all of these cases,

24   that Mr. Saintvil was -- had a defined limited purpose, had

25   very little authority over anybody, was a subcontractor for

1    specific services.

2           So now I have to determine what the relative

3    culpability is as between Mr. Murray and Mr. Hill, and that's

4    what I'm trying to do.  And I just think looking coherently

5    at all of these facts and the way that they as a practical

6    matter operated, that it looks to me that if somebody is --

7    that even if you want to call them both having some sort of

8    supervisory role, that -- which I'm not sure that I'm

9    convinced that Mr. Murray had one, but it's clear to me that

10   the person who was putting things in place and directing was

11   Mr. Hill.

12          And if I'm going to do my job, which is to assess

13   relative culpability to try to come up with a guideline

14   recommendation that recognizes the relative responsibility

15   the people have for the organization, I continue to come down

16   on the side of, that with respect to Mr. Hill and Mr. Murray

17   in this case, it seemed to be that the person who was really

18   the supervisor and leader was more Hill than Murray.  And

19   that's just the way it has shaken out for me.

20          MS. CLERK:  Your Honor, the government understands

21   that.

22          I would just like to point out with respect to

23   Case 286 that we believe that the facts are different.  In

24   this case, Your Honor, that Mr. Murray was the one who we

25   believe was exercising decision-making authority here.

```
1              He obtained the hotel room for the minor J.B. to

2    engage in commercial sex acts.  Mr. Murray was the one who

3    arranged for Mr. Branch to drive J.B. around from

4    Fulton Industrial Boulevard to some of the motels.  He also,

5    Your Honor, purchased the provocative clothing for J.B. to

6    wear when she was engaged in the commercial sex acts.

7              We do believe -- and he also, Your Honor, the money

8    that J.B. earned was given to Mr. Murray and divided between

9    him and Mr. King.

10             So I believe those factors, Your Honor, support the

11   enhancement under 3B 1.1 (c) in Case No. 286 for an

12   enhancement role as a leader or supervisor, Your Honor.

13             Thank you.

14             THE COURT:  All right.  Mr. Secret?

15             MR. SECRET:  I do not have very much to add.

16             THE COURT:  Yeah.  Actually, my analysis works for

17   you in one case and works against you in the other.

18             MR. SECRET:  Right.  And I would say in 286, Judge,

19   I mean, you know, you understand my argument in the

20   sentencing memorandum.  I know what the facts are in 286.

21             And in 285, I think the Court's analysis is

22   correct.

23             THE COURT:  Well, it doesn't surprise me that you

24   agree with my analysis in the 285 case.

25             But I do believe, I have thought long and hard
```

1      about this, so I'm going to sustain the objection to the

2      application of the enhancement in the 285 case, and overrule

3      it with respect to the enhancement in the 286 case.

4                And just so that I don't lose track of where we

5      are, then my finding with respect to the 285 case as far as

6      where we are in the adjusted offense level I believe is 36

7      and in the 286 case it would be 38.

8                MR. SECRET:  Correct.

9                THE COURT:  Is that correct?

10               Does anybody disagree with where we are so far?

11     Ms. Clerk?

12               MS. CLERK:  I think that's right, Your Honor.

13               MR. SECRET:  Yes, I agree.

14               THE COURT:  I'm not quite sure where we go

15     next.  There is -- Mr. Secret, you have made a couple of

16     I would say not strictly guideline arguments having generally

17     to do with criminal history category, but let's leave that

18     for a second.

19               MR. SECRET:  Okay.

20               THE COURT:  Where I would like to go now is

21     acceptance of responsibility.  That I think is the

22     defendant's burden, isn't it, and we will begin with you,

23     Mr. Secret?

24               MR. SECRET:  Your Honor, this is a difficult one.

25               I have looked at, in trying to frame my argument,

1    at the psychiatric report from Dr. Marks, then the

2    psychiatric report subsequent to that, of course, the

3    pleading that was filed *pro se* on behalf of Mr. Murray.  And

4    this is how I see those facts.

5              Mr. Murray comes before this Court --

6              THE COURT:  Before you go on.  Let me -- I agree

7    this is unusual.

8              MR. SECRET:  Yes.

9              THE COURT:  And so let me tell you what I believe

10   acceptance of responsibility means and where it should fit in

11   the guidelines.

12             There are lots of cases with the government where

13   somebody right on the eve of trial after I have been back

14   there doing motions *in limine* will come in and say they have

15   accepted responsibility and they ought to get the full three

16   credits.  We have got these intervening factors here.

17             The purpose of acceptance of responsibility in my

18   mind is that it's one of the least technical of the guideline

19   criteria.  And the way that I view it and the way that

20   I think the commission views it is that looking at what a

21   reasonable sentence is for somebody, by the time that they

22   get to sentencing, knowing that this is a dynamic process,

23   there is lots of tension and pressure and anxiety not only on

24   the victims but also on defendants, they react differently to

25   it.

1        I have had people sit in that chair accept

2   responsibility and they have said all the right things, but I

3   believe they have accepted no responsibility, but there is

4   not enough facts for me to find that they haven't to deny

5   them that, and the government never requests it, even though

6   I suspect that they feel the same way I do.

7        What I don't have in this case -- and you are just

8   going to have to make a call on this -- is that I don't

9   really know where Mr. Murray is.  I have got this mixed --

10  okay, this mixed record on -- because I went back and pulled

11  his change of plea hearing.

12       And I will say this.  That in a -- and I remember

13  it, although it was a long time ago.  But in reading the

14  transcript, it refreshed my memory, as hard as it was to get

15  to that point, and I wonder, you know, when somebody makes

16  the decision, Mr. Murray, like you did fairly late, I just

17  kind of wonder what's going to happen at the change of plea

18  hearing.  And there have been some times that I rejected it

19  because I don't think that they really admit that they have

20  engaged in conduct.

21       But in some very short series of questions,

22  including the ones that I asked after the summary was given

23  by the government, Mr. Murray looked at me and answered my

24  questions without any qualification that he admitted what he

25  did, admitted it was wrong, knew that what he was doing was a

1    crime, and there wasn't any embellishment or anything to

2    qualify in any way.  They were straight, and I took them then

3    as honest.

4            I just -- but to get acceptance, I think I need to

5    be convinced of that today.

6            MR. SECRET:  Let me first respond by saying one of

7    the things I was going to ask for is for Your Honor sort of

8    to reserve its ruling on this issue until Mr. Murray got his

9    opportunity to allocute.

10           But I will say this.  That acceptance of

11   responsibility -- this has been my experience in representing

12   defendants -- is a real fluid thing.

13           That on the one hand you will find a defendant who

14   is charged with a very clear substantive charge about which a

15   defendant can say, okay, I'm guilty of that.

16           But then you have, you know, pages and pages and

17   pages of discovery, and very specific allegations of some of

18   the young ladies in this instance, some of which he does not

19   agree with:  I didn't do that or I didn't do this.

20           In that attorney-client relationship, there is this

21   exchange, you know, there is this trying to come to this

22   meeting of the minds of what acceptance of responsibility is,

23   what you are pleading to, what is important and significant,

24   and some of these other outlying facts, some of these

25   secondary facts are really not that important, and, no, by

1    pleading guilty you will not get your opportunity to come

2    before the Court and say that that particular fact is not

3    true or this particular fact is not true.  So those become

4    points of contention, and particularly with a person like

5    Mr. Murray, who has never been in this kind of legal

6    environment, finds it difficult to understand.

7            So I would say -- I certainly want him to

8    allocute.  I am not willing to submit him to

9    cross-examination.  That's what I don't necessarily want to

10   do.

11           THE COURT:  And I never -- in the years I have been

12   doing this, in order to make an acceptance of responsibility

13   determination, I have never required somebody to be subject

14   to cross-examination.

15           MR. SECRET:  Yes.  So he's very prepared to make a

16   statement, if the Court wants to hear from him now or at a

17   later time.

18           THE COURT:  Let me hear from Ms. Clerk.  I mean,

19   I think she will understand where I am on this.

20           MR. SECRET:  May I please, before you go,

21   Ms. Clerk?

22           MS. CLERK:  Yes.

23           MR. SECRET:  I'm sorry.  There are some other

24   things I was going to say before Your Honor began.

25           So in the context of that contention between

1  attorney and client, clients act a certain way, and it's

2  always different.  They say certain things.

3          Sometimes it gets rather -- they are angry and

4  there is some -- I guess there can be some question about

5  whether the anger is because of the situation that they find

6  themselves in or something that they believe that their

7  lawyer hasn't adequately done for them.  I don't know what

8  it's done clearly in this case.

9          But clearly Ms. Panitch saw something that she

10 didn't think was ordinary and she asked for a psychiatric

11 evaluation.

12          During the psychiatric evaluation, Mr. Murray was

13 uncooperative when asked about his mental and emotional

14 state.  He did not give any false information.  He did not --

15 I mean, you know -- and whether or not his demeanor or acting

16 was -- acting out was anger, was -- whatever it was, I don't

17 think it was a statement of saying I didn't do what I have

18 pled guilty to.

19          The other thing in terms of the letter or the

20 pleading, you know, there is what I call -- some people call

21 them jailhouse lawyers, your know, I call them inmate

22 intelligentsia who are in the jailhouse telling inmates what

23 to do and how to prosecute their cases in a *pro se* manner.

24 And he would say this pleading was written by another inmate

25 and counseled to him by another inmate.  Of course,

1    ultimately he made the decision to send it.

2         And those are facts that I just wanted the Court to

3    be aware of.

4         THE COURT:  All right.  Thank you.

5         MS. CLERK:  Your Honor, I guess I would have to say

6    I agree with the Court's words about it's kind of a mixed bag

7    here.

8         Of course, the government's position is that we

9    believe that Mr. Murray's conduct has raised doubts about his

10   genuine acceptance of responsibility.  And as I understand it

11   from the discussion regarding the videotape, that at some

12   point Mr. Murray said that he had not received the two girls

13   in the police car, that that information was very available

14   to him.  And he really needed to have that information, and,

15   of course, he had it and should have had it, Your Honor.

16        And so there is an issue in terms of the

17   credibility of these two young girls, O.M. and A.C., that

18   seems to creep up constantly with Mr. Murray with that case.

19        THE COURT:  I don't think -- we are using the wrong

20   term, credibility.

21        MS. CLERK:  I'm just using the word that Mr. Secret

22   used, Your Honor.

23        THE COURT:  Well, I know, but I'm not sure --

24   that's not the way I interpret it.  I mean, it's my

25   responsibility to figure out what happened here, and here

1    is what -- this is the way I interpret it.

2             Just like a defendant going through this sort of

3    process has anxieties and has motivations that you wouldn't

4    expect, I think some victim who has gone through this

5    environment, at the age at which they are, aren't the best

6    people to clearly articulate and to think that everything

7    they say is going to be subjected later to some scrutiny by

8    law enforcement or by a court or by a judge.

9             And so it's harder for me, under the dynamics and

10   the tensions, whether you are a victim or you are a

11   defendant, to figure out what I think based upon my

12   experience really happened.

13            MS. CLERK:  I agree, Your Honor.  In fact, I was

14   going to point out that very fact to the Court, that these

15   are two 14-year-old girls, and given the circumstances and

16   all of the things that were occurring in their lives, therein

17   lies the statements.  And I will move forward from that

18   issue.

19            THE COURT:  Right, and that's a good point.  That

20   just where they had come from before they ever got involved

21   in this would have created it hard for them to tell a

22   coherent, detailed, structured story that we can all sit back

23   and say that's what happened.

24            MS. CLERK:  That's correct, Your Honor.

25            THE COURT:  It's somewhere in all of that --

1    I think fog is not the right word, but it's somewhat

2    ambiguous, and I have got to sort out what I can find as a

3    fact and what I can't.

4            MS. CLERK:  And I think you are right, Your Honor.

5    The interpretation of all of those events is very difficult

6    because we don't have everything in context.

7            THE COURT:  Right.

8            MS. CLERK:  I would just point out, Your Honor,

9    that the only other point the government made with respect to

10   this issue was the fact that Mr. Murray was very explicit in

11   the letter to the Court with respect to having new counsel,

12   that his statements were the fact that he wanted to go to

13   trial, he did not desire to enter a plea, and he felt that he

14   was innocent.

15           Now, I don't know the context again, as the Court

16   said, and maybe Mr. Murray can elaborate.  I don't know what

17   the context was and how he came to make these statements, but

18   that was the basis of the government's recommendation,

19   Your Honor --

20           THE COURT:  I understand.

21           MS. CLERK:  -- that the acceptance of

22   responsibility not be given.  So that's the government's

23   position, Your Honor.

24           THE COURT:  And I will just say for the lawyers

25   that with respect to his prior representation, especially

1    when it gets to the point where a defendant has either lost

2    confidence -- and that happens more often than I care for it

3    to happen.

4           And I don't think it's the lawyer's fault.  I don't

5    think it's the defendant's fault.  Sometimes it is that

6    something just happens in the nature of the relationship that

7    there is a distrust that, frankly, when I talk to the

8    lawyers, will say the same thing about they don't trust their

9    client anymore, and that's when I say, well, then there has

10   got to be something -- something has to change in order for

11   me to get to the point where all of us have as much

12   unfiltered honest information as possible.

13          Mr. Secret, I appreciate you stepping in.  I think

14   that you have accomplished that for us, and I thank you for

15   doing that.

16          Which is why I think it's important for me -- and

17   maybe we should let Mr. Murray allocute now.  I just need to

18   know where he is.

19          MS. CLERK:  Your Honor, and I understand.   And

20   sometimes, you know, with respect to the process -- I think

21   Mr. Secret mentioned about the process -- Mr. Murray has not

22   been in federal court before, and it was a long, arduous

23   process getting here.  So I'm sure there was probably some

24   misunderstanding, miscommunication and that kind of thing

25   between defense counsel and Mr. Murray.

1           But that was the basis for the government's

2    representation with respect to this issue, Your Honor.

3           THE COURT:  No, I understand.

4           And I will say that somebody must have given the

5    defense lawyers a seminar about the availability of federal

6    funds to do evaluations because that has been a recent

7    phenomenon.

8           MS. CLERK:  Yes.

9           THE COURT:  I think it's fine.  It slows things

10   down, but I wonder whether that accounts for this idea that

11   maybe it's a good idea whenever you have an issue that in the

12   context of a case like this, what's some more money to get a

13   professional opinion on something.

14          I'm not saying -- I think maybe there was some of

15   that here, but it did delay things.  But I think it also

16   confuses the facts when you have got now professionals

17   reaching opinions about somebody's mental health.

18          Which takes me back to where I think I need to be,

19   which is -- and my suggestion is going to be, unless there

20   is an objection, that I need to hear from Mr. Murray about

21   where he is with respect to this conduct in which he engaged

22   and does he really accept responsibility for what he did.

23          MS. CLERK:  There is no objection from the

24   government, Your Honor.

25          MR. SECRET:  Do you want him to stand here or at

1    the podium, Your Honor?

2           THE COURT:  Wherever he's -- I need him to be where

3    he is most comfortable so I can get the clearest expression

4    of where he is today.

5           DEFENDANT MURRAY:  How are you doing, Judge?

6           THE COURT:  Fine, thank you.

7           DEFENDANT MURRAY:  I wrote this down today to tell

8    you how I feel about my case here, the whole situation and

9    everything today.  I wrote it down so you can hear my views

10   and my ideas.

11          First of all, I want to thank my friends and family

12   for being here today and going through the trials and

13   tribulations of this situation, Your Honor, with me.

14          I also want to apologize to you and the court for

15   being in front of you under these circumstances, let alone

16   any circumstances.

17          Judge Duffey, before this incident with Mr. Hill, I

18   had never been around, nor have I been involved in any form

19   of sex trafficking.

20          I'm saying that now I am a firm believer of the

21   areas you hang at and the people you affiliate yourself with

22   can ultimately affect decisions that you make that you

23   wouldn't normally make.

24          Though I may disagree with some of the facts in

25   this case, I accept the Court's ruling and I accept full

1    responsibility for my actions.

2            I apologize to these young women who because of the

3    circumstances find themselves in the street.  I certainly

4    wouldn't want my daughter under these circumstances, and

5    I grew up around women.

6            I know that I have to do some time, Judge, but I'm

7    not a throw-away.  I have changed, and I can change more in

8    the future if you give me a chance to do that.

9            With that said, I ask for you to show me mercy,

10   that I may have the opportunity to show and prove to you and

11   the rest of society that I am an asset, not a liability, to

12   the community and my fellow man.

13           Thank you.

14           Judge Duffey, this is my first time being

15   incarcerated and confined for this long.  And I was going

16   through a lot of things.  I was under duress.  I didn't know

17   what to do.  I thought of going through a lot of things I

18   can't really explain.

19           I felt like my counsel -- not Mr. Secret, my

20   counsel before him -- she wasn't listening to me.  My back

21   was up against the wall, and I went under a state that

22   I didn't know where I was, I didn't know myself half the

23   time.

24           I'm sorry for this -- the incident and everything

25   that happened, but as I said, I have a daughter.  I wouldn't

1     want my daughter going through that, period.

2              I grew up around women.  They didn't raise me like

3     that.  I just got myself caught up in something I shouldn't

4     have got myself caught up in.

5              This ain't what I do.  I never did this.  It's not

6     what I do.  I just got myself in a situation.  I know I have

7     never -- and I will never get myself into it again.

8              As I say, Judge, I know I have to do some time, and

9     I apologize to these girls, I apologize to their families.

10    I just ask for your mercy on the Court.  I ask for your

11    mercy, Lord -- I mean, I ask for your mercy, Judge.  I can

12    show you.

13             Thank you for your time, Judge.

14             THE COURT:  Mr. Murray, I want to follow up on a

15    couple of things.

16             You made a comment about your back being up against

17    the wall when you were talking about your relationship with

18    Ms. Panitch, and I think that's -- I just want to ask you

19    something using that same phrase.

20             There was a moment in time some time ago where you

21    and Mr. Hill saw two young girls.  And this is about

22    you.  You made a decision --

23             DEFENDANT MURRAY:  Yes, I did.

24             THE COURT:  -- beginning with having sex with them,

25    and then standing outside rooms when you knew that you had

1  arranged for them to go in and have sex with somebody they

2  didn't even know for which you were going to get some

3  money.

4       Do you admit you did that?

5       DEFENDANT MURRAY:  Yes, sir.

6       THE COURT:  What took you to a place -- because

7  your back wasn't up against a wall then.  What took you to

8  the place that you could ever do that to a young girl?

9       DEFENDANT MURRAY:  I wasn't saying that my back was

10  against the wall.  I wasn't saying my back was against the

11  wall then.  I was saying my back was against the wall with my

12  lawyer, my counsel at the time, Judge.

13       THE COURT:  Well, let's go back to when you are

14  standing outside that room, how could you, a man, allow young

15  girls to go in and make you money by offering themselves for

16  sex with men that you had arranged?  How could you have done

17  that?

18       DEFENDANT MURRAY:  Judge, there is no excuse, no

19  excuse for that.  I'm sorry for that.  I'm sorry, I'm sorry

20  for the females.  They -- I don't know.  It was my decision

21  to be around them people, but I was influenced.

22       But it's my decision.  It was my decision.  I don't

23  know.  I apologize to -- I apologize about that.  I don't

24  know.  I don't know, Judge.

25       THE COURT:  Let's go to --

1          DEFENDANT MURRAY:  I know it wasn't right.

2          THE COURT:  I'm sorry.

3          Let's go to the next case for a second.  Now

4    Mr. Hill is out of it.  It's you and Mr. King, and you see

5    this young girl I guess fall out or run out or bolt out of a

6    car.

7          When I first read, you know, the facts of this

8    case, I saw that you had actually tried to help her, and the

9    next thing you know, without Mr. Hill being around, you drive

10   her to an Extended Stay Hotel and you do the same thing you

11   did with the first two girls.

12         How could you have done that?  Why did you do

13   that?

14         DEFENDANT MURRAY:  I was under the influence of

15   other things I was going through.  Like I said, Judge, I

16   apologize for that.

17         There is no excuse.  There is no excuse for

18   that.  I apologize.  I was just -- a lot was going on with me

19   at the time.  I didn't know what to do.  You know, I was

20   just -- I was just -- there was a lot going on with me.

21         Like I say, there is no excuse for that.  There was

22   no excuse for that.

23         THE COURT:  Do you admit that there are very few

24   things worse than somebody like you taking advantage and

25   using a woman the way that you did?  Do you understand and

1    accept that you did that?

2              DEFENDANT MURRAY:  Yes, sir.  Like I said, this

3    wasn't my normal activity.  I never -- before these

4    incidents, I never did that, period, before.

5              I understand and I'm sorry for it.  I never did

6    that, period.  Ask my family and my friends.  Anybody could

7    tell you about me.  I never did that, period, before.

8              Why I went that direction, I don't know.  It was a

9    mistake I made.  I'm sorry for that mistake I made.

10             If you have mercy on me today, I will try to

11   correct it.  I will try to correct the mistake I made, if I

12   can, by helping others and deterring people from that

13   life-style.

14             THE COURT:  I think you are trying to be

15   straightforward.  I'm going to be straightforward with you,

16   because what I have to decide is whether or not you get a

17   pretty substantial credit under the guidelines for accepting

18   responsibility, and I have to be convinced based upon how we

19   got here and how you got here that you really have accepted

20   responsibility.

21             And here is where I am now.  I think you are sorry

22   that you got caught, and I think you are truly sorry that you

23   got caught, but I have yet to see that you have really

24   understood what you did to these young girls.

25             I know you are sorry it happened to them, but there

1    is a word that we use in court and we also use it out when we

2    talk to people that's called remorse, do you really in your

3    heart feel sorry for what you have done, and I don't know if

4    you do.

5         DEFENDANT MURRAY:  Yes, I do, Judge.

6         Like I said, I have a daughter.  I have a

7    daughter.  She's nine years old.  I can't imagine she going

8    through what those other girls do.

9         And that's why I know I was wrong.  Everything in

10   me says I was wrong.  I was raised by females.  I know it was

11   wrong.

12        Why I did that, why did I go that direction, I

13   don't know.  I just want an opportunity -- I want to make

14   sure my daughter don't go in that direction.  Because I know

15   what goes around comes around.  I just want to make sure to

16   deter her from that.

17        And hopefully I can reach out to some other youth

18   and deter them from this life-style, because it doesn't lead

19   nowhere but here.

20        Judge, I'm sorry it happened to these girls.  I

21   don't know what they are going through mentally at the time

22   and right now.  I know it's a whole lot to take in at that

23   age, at any age.  And I'm sorry for that.

24        THE COURT:  All right.  Thank you, Mr. Murray.

25        This is a hard call for me.  I have thought more

1    about this case than a lot of other cases.

2             One, is just trying to understand in a community

3    like the one the defendant and the victims come from, which

4    I admittedly am not that familiar with because I grew up in a

5    different place at a different time, and neither the victims

6    nor the defendant had the sort of influences that I had in my

7    life, although it sounds to me, Mr. Murray, like you had

8    tremendous women in your life, and I think in a very real way

9    you've betrayed them because you did exactly what they didn't

10   want you to do, which is the way you treated these young

11   girls.

12            This is not a perfect system.  Finding facts like

13   this is not a perfect process.  I find that whenever I'm on

14   the fence like this, that justice requires that I resolve

15   whatever doubts I have in favor of the mercy component of

16   what I do.

17            And for that reason I'm going to overrule -- I'm

18   going to sustain the objection to failure to grant acceptance

19   of responsibility, and I will award the three-point reduction

20   in both cases.

21            Which means I think now the adjusted offense level

22   before the grouping rule application would be in the 285 case

23   an adjusted offense level of 33 and in the 286 case an

24   adjusted offense level of 35.

25            Are there any objections to those intermediary

1    findings?

2           MS. CLERK:  No, not from the government,

3    Your Honor.

4           MR. SECRET:  No, Your Honor.

5           THE COURT:  And then the finding -- I don't think

6    anybody has objected to the increase for the total number of

7    units of an increase of two points to each of those adjusted

8    offense levels, which would mean that in the 286 case it

9    would be 37 and in the 285 case it would be 35.

10          Which means that the total offense level would be

11   37, the higher of the two.  Any objection to that finding?

12          MR. SECRET:  No, Your Honor.

13          MS. CLERK:  No, Your Honor.

14          THE COURT:  And while I know you have an argument

15   about based upon the criminal history category, but

16   calculating it under the guidelines -- and we will talk about

17   whether or not it overrepresents in a second because that

18   would be a variance or a departure -- but my finding on

19   criminal history category would be that his criminal history

20   category is four.

21          Is there any objection to that finding?

22          MR. SECRET:  No, Your Honor.

23          THE COURT:  That then provides for a custody

24   guideline range of 292 to 365 months, and a fine guideline

25   range of $20,000 to $200,000.  Are there any objections to

1    those findings?

2                MS. CLERK:  No, Your Honor.

3                MR. SECRET:  No, Your Honor.

4                THE COURT:  All right.  Then having made my

5    guideline findings, the next thing we will do is if there is

6    anything in addition to what you have already presented,

7    Mr. Secret -- well, maybe we ought to take up your arguments

8    that you have with respect to the overrepresentation of his

9    criminal history category.

10                MR. SECRET:  Yes, Your Honor.

11                Of course, the Court has the authority to

12    downwardly depart if the Court finds that the criminal

13    history as stated or as presented, objectively, if it

14    substantially overstates the defendant's criminal history

15    insofar as his I guess dangerousness or his likelihood of

16    reoffending.  And I guess my argument, Your Honor, is

17    somewhat, somewhat linked, because it goes at that sort of

18    indirectly.

19                There are two particular offenses in his criminal

20    history that concern me.

21                One is the obstruction that occurred on January

22    23rd, 2012.  He was 24.  And in that incident, the police

23    received a call about some burglary or something that's

24    taking place in an apartment complex, and they come and they

25    find two African-American men in a car and approach them, and

1    they run.

2         Mr. Murray spends one hundred days in jail,

3    probably because he didn't feel like he did anything wrong,

4    and then at some point the prosecutor comes to him and says

5    and his defense lawyer says to him, listen, if you go ahead

6    and admit the guilt of this, we will let you out of jail and

7    you can go.  He admits it and he goes.

8         And there is another offense almost exactly the

9    same where he ran from the police, and that would be the

10   offense that occurred on again March the 2nd, 2012, at the

11   age of 24, when they are supposedly sitting illegally in a

12   parked car.  And again he's approached by the police, and the

13   police approach them and they get out and run.  And he stays

14   in jail for a significant period of time and then gets a

15   hundred days and leaves.  In fact, those two incidents --

16   I think he pleads to both of those charges at the same

17   time.

18        The other charges that he has I believe on his

19   criminal history are misdemeanors.  There are no offenses

20   that involve weapons.  There are no offenses that involve

21   prostitution or even sex trafficking.

22        But for those, and if that were not the case, then

23   his criminal history category -- without those two offenses

24   he would be a four.

25        THE COURT:  No, he is a four now.

1          MR. SECRET:  I'm sorry, he would have a total of

2     four points, and that would probably put him in a criminal

3     history category two.  And that's what I'm asking the Court

4     to consider downwardly departing to.

5          THE COURT:  Ms. Clerk?

6          MS. CLERK:  Your Honor, I believe that the

7     probation officer's response to Mr. Secret's objection to the

8     criminal history points reflected on her policy reasons about

9     the fact that Mr. Murray has demonstrated the propensity to

10    continue to violate the law in terms of his recidivism.

11         Mr. Secret started his argument to the Court from

12    the January 2012 obstruction charge, and he then references

13    the March 2012 obstruction charge.  However, the government

14    believes that Mr. Murray's conduct should be looked at from

15    the beginning when he was 22 years old.

16         Your Honor, when he was given a probated sentence,

17    he failed to pay his probation fees, and he was revoked twice

18    for that offense.  I believe it was criminal trespassing,

19    theft by taking.

20         THE COURT:  But wasn't he revoked for not paying

21    the --

22         MS. CLERK:  Revoked for not paying probation fees

23    and I believe also the second time for not paying three

24    hundred and something dollars.  Let's see here.

25         THE COURT:  Well, that would be --

1            MS. CLERK:  $380 probation fees.  And I believe at

2      the time he also had another arrest, Your Honor, the

3      aggravated assault.  This is in Paragraph 97 on page 22,

4      Your Honor.

5            THE COURT:  But he was not convicted for that, was

6      he?

7            MS. CLERK:  He was not convicted for that,

8      Your Honor, and it looks like it's still pending before the

9      Cobb County Superior Court.  There is a revocation hearing

10     pending for those charges.

11           Now, Your Honor, he was not convicted for those

12     charges.  There is not a conviction on his record for those

13     charges.  I think that was the basis for the recommendation

14     for probation revocation in that because he did not have a

15     hearing, because between that time Mr. Murray was arrested on

16     these federal charges.

17           THE COURT:  So there is really no adjudication for

18     that?

19           MS. CLERK:  That's correct, Your Honor.

20           I just point out to the Court that with respect to

21     the first offense that Mr. Murray received criminal history

22     points for, he was not complying with the law, not complying

23     with probation.

24           THE COURT:  Yeah, but you don't see all the

25     supervised release reports that I get where people can't pay

1   what they are supposed to pay.  If I did that, I would revoke

2   everybody.

3          MS. CLERK:  Well, Your Honor, I understand that.

4   But I don't think it's just the fact that he wasn't paying

5   what he was supposed to pay.  It's that he did not do

6   anything.  He did not complete his GED requirements, he did

7   not do any of the things that he was supposed to do on

8   probation.  So because he was revoked, he gets two criminal

9   history points associated with that conduct.

10          With respect to the obstruction charges that

11  Mr. Akil Secret was referring from January of 2012 and March

12  of 2012, it looks like in January 2012, Your Honor, when

13  Mr. Murray was given commands to stop, he did not, and he

14  escaped.  They weren't able to catch him.

15          And then on the second occasion in March, I think

16  they did catch him after a short quick chase.  Again, the

17  same kind of conduct where he's failing to obey the law, and

18  I do think the Court can take that into consideration in

19  determining whether or not, as the probation officer has

20  determined, that he has the likelihood or propensity to

21  continue to violate the law.

22          And I think he's assessed two additional criminal

23  history points, Your Honor, because he was on probation at

24  the time he was arrested for this offense conduct.

25          Our offense conduct occurred in February of 2012,

1   and I believe he was with J.B. in May of 2012.  So this is

2   from January 2012, March 2012, February 2012, and May 2012

3   he's involved in criminal conduct continuously, Your Honor.

4           So I don't believe that the criminal history points

5   overrepresent his criminal history.  I think they are

6   adequately and appropriately assessed, Your Honor.

7           THE COURT:  You know, the departure itself provides

8   that if I were to grant a departure based upon criminal

9   history, that I would have to state the specific reasons why

10  an applicable criminal history range substantially

11  overrepresents the seriousness of the defendant's criminal

12  history or the likelihood that the defendant will commit

13  other crimes.

14          So the qualification is substantially

15  overrepresents.  I think, Mr. Secret, you have made a

16  plausible argument that, looking at what he's done, that

17  there is some overrepresentation of the seriousness of his

18  criminal history, but it has to be substantial.

19          And while a lot of what you've said makes sense to

20  me, I don't think I can find -- in fact, I know I can't find

21  that it substantially overrepresents the seriousness of his

22  criminal history or the likelihood that he will commit other

23  crimes.

24          And while I'm dening the departure, I am going to

25  take that into consideration in determining what sentence to

1    impose.

2              So I think those are all the pending legal issues

3    that I have to decide, but I want to make sure --

4              MS. CLERK:  That's right, Your Honor.

5              MR. SECRET:  Yes, Your Honor.

6              THE COURT:  So now let's move on to whatever else

7    you would like to present in addition to the letters that

8    I have read in extenuation and mitigation.  And then I will

9    hear from you, Mr. Secret, and then I will hear from

10   Ms. Clerk.  And if there is anything else that Mr. Murray

11   would like to say before I determine a sentence, I would let

12   him have another chance to speak.

13             MS. CLERK:  Your Honor, I am not sure if the

14   Court was aware that there is one family member here that

15   would like to make a statement to the Court.  It's O.M.'s

16   sister.

17             THE COURT:  Let's do that after the mitigation and

18   extenuation portion.

19             MS. CLERK:  Thank you, Your Honor.

20             MR. SECRET:  Your Honor, if you are ready to hear

21   from those in support?

22             THE COURT:  I am.

23             MR. SECRET:  Do you want her sworn, Your Honor?

24             THE COURT:  No.

25             MR. SECRET:  Would you state your name please?

1          MS. MURRAY ISLER:  Sheila Murray Isler.

2          MR. SECRET:  Ms. Isler, are you related to

3   Mr. Murray?

4          MS. MURRAY ISLER:  He's my son.

5          MR. SECRET:  Is there something that you wanted to

6   share with the Court?

7          MS. MURRAY ISLER:  Yes.  I just want to say that we

8   raised my son to respect women.

9          And, yes, he ran with the wrong crowd.  And he's

10  always been a good person, he's always been a kind person,

11  he's always been a giving person.

12         And, yes, I have to get on him about running around

13  with people that didn't share his interests.  My son was

14  always positive.  He was aspiring to be a rapper, and he was

15  doing well in school.

16         My son was bullied in school, and officials, they

17  didn't want to do anything about it.  It got to the point

18  where my husband and I feared for his life because the school

19  officials would not do anything about it.

20         So I made an agreement with him that he could drop

21  out of school so he could get his GED.  And so he did well

22  and I had certificates that he was doing well in school.

23         And just like I said, he, you know, started running

24  with the people that didn't share his interests, didn't share

25  the way he was raised.  He was raised well, he was raised in

1   the church, he was raised to do right.  He was paying his

2   tithes, he was paying his offerings, he was doing all of

3   that.

4           And I honestly believe that my son is sorry for

5   what he did, he is remorseful for what he did.  I don't

6   believe that he's sorry that he got caught.  I believe that

7   he is truly remorseful for what he did.

8           He has a daughter that loves him, that prays for

9   him.  He has a daughter that gets on her knees and asks for

10  mercy for her father.  He is the joy of her life.

11          And he has a close relationship with my mother and

12  me and my sisters that are here, my husband, his biological

13  father that's here.

14          So I am just asking you to have mercy on my son,

15  because I know that my son is remorseful for what he did.

16          Thank you.

17          THE COURT:  Thank you very much.

18          MR. SECRET:  State your name for me, please, ma'am?

19          MS. DOROTHY MURRAY:  Dorothy Murray.

20          MR. SECRET:  And, Ms. Murray, you are related to

21  Fabian Murray?

22          MS. DOROTHY MURRAY:  Yes.

23          MR. SECRET:  How are you related to him?

24          MS. DOROTHY MURRAY:  I'm his grandmother.

25          MR. SECRET:  Is there something that you wanted to

1    share with Judge Duffey?

2            MS. DOROTHY MURRAY:  Yes.

3            When Fabian was born and left the hospital, he came

4    to my home.  And I raised Fabian, and my mother, until he was

5    past twelve years of age.

6            When he was a child, his mother moved to Atlanta,

7    and after his twelfth birthday, she moved him to Atlanta.

8            When Fabian was in school, he got good conduct.

9    All his teachers loved him.  He was a member of the boys

10   team -- club.  He was a member of the T-ball team.  He went

11   to church.  And he was a good child.  I didn't have any

12   problems with him.

13           If he didn't agree with my mother if I wasn't at

14   home, all my mother had to do was call me on the phone,

15   I would talk to Fabian, and she would call me back and say

16   everything was fine.  He was a joy to my mother.  My mother,

17   he was the reason that my mother got up early every morning.

18           And I didn't have problems, I didn't have to spank

19   Fabian for anything.  He was just a good child.  He was very

20   sensitive, but he was always a follower and not a leader.

21   And I tried to teach him to think for himself, not let other

22   people think for him.

23           And he wasn't a child that was in the streets.  He

24   was at home.  Because that was my rule for all of my

25   children, you didn't go out on dates or anything until you

1    were sixteen years old, and he had no problem with that.

2           So when his mother moved him to Atlanta, he

3    basically went to a new town, a new school, a new home, and

4    basically a new family, because he had been with me since he

5    was past twelve years old.  And he was -- like I say,

6    I didn't have any problem with him.

7           His dream was to become a famous rapper.  He said,

8    Momma -- he always called me momma.  He's the only grandchild

9    that calls me momma.  He said, Momma, when I become a -- when

10   I make it big and I become a famous rapper, he said, I am

11   going to take care of you, you won't have to work so hard.

12          And he had gotten a job at a warehouse, and a

13   producer called him and told him that he thinks he would be

14   able to set him up, and he left his job, and he said he was

15   so excited.  He said, Momma, I have got a chance to make it

16   big so I can take care of you.

17          And, Fabian, he is a good person.  And he got to

18   Atlanta, and I think he just -- he met up with the city

19   guys.  And when you take a tame dog and put him with a bunch

20   of wild dogs, that tame dog is not going to tame the wild

21   dogs.

22          And he met his daughter, and he loved his daughter

23   and they have a good relationship.

24          And he is a good person, but somewhere along the

25   line he made bad choices and bad decisions that landed him

1    here.  And I believe that he is truly sorry for his actions.

2    And I ask the Court to have mercy on Fabian and not take his

3    life away.

4         I am 73 years old, and I want to see Fabian walk

5    out that courtroom -- walk out of prison a young man, a

6    changed man, and a man that's full of love of God.

7         Thank you.

8         THE COURT:  Before you leave, can I say a couple of

9    things?

10        I think he will come out a changed man, and he will

11   be a little older, but time does that to all of us.  We age

12   some.  But -- and in listening to his mother and now

13   listening to you, it just strikes me that he's had really

14   good influences on his life.

15        But I do also agree with you that there comes

16   something that is irresistible to young men to be accepted by

17   other young men, even if they are evil.  And I don't know why

18   we are wired that way, but I think we probably all are

19   wired.  To some extent, we are susceptible to bad

20   influences.

21        And I do believe that what happened to your son was

22   that he began to accept the influences of people, but I also

23   believe that he knew the whole time that he was engaged in

24   this that he was not only doing something that was terribly a

25   bad choice, but that he knew that what he was doing was

1    criminally wrong, and I think that he knew it was morally

2    wrong.

3          And I think in his heart he knew that if you were

4    aware that he was doing this, that it would break your

5    heart.  And it has.  Because I can see it in both what you

6    have said and what his mother said.

7          One of the responsibilities I have is to try to be

8    merciful.  His guideline range, which is the tool that we use

9    to try to impose proportionate sentences, is high.  I mean,

10   you heard what I announced and what the guidelines are going

11   to recommend, and what they do recommend is a period of

12   incarceration of 292 to 365 months.

13         I just want you to listen ultimately to what

14   sentence he gets to see if I have taken into account who he

15   is and what I see in him and the worth that there is in him.

16   But I also have to hold him accountable to our community and

17   our country.

18         And I told you that I thought a lot about this

19   case.  One of the reasons why I thought a lot about this

20   case is there are too many of these cases, way too many.

21   There are too many young men like your son that find young

22   girls like the victims and go to motel rooms across this

23   city and do exactly what you heard was done, and it's got to

24   stop.  And the community and the country and I personally

25   believe it needs to stop.

1          And one of the ways we do that is by telling people

2     that even think about this that the cost is high.  And my job

3     is to try to find what would satisfy and deter other people,

4     at the same time be fair to your son from what I believe I

5     know about him.

6          You know, the final thing I will say is that it is

7     hard to imagine as a father with a daughter, to walk down the

8     hallway of a motel knowing that behind that door is some

9     selfish, self-serving man who is willing to pay to have sex

10    with young girls, and how somebody can do that knowing that

11    at home they have a nine-year-old daughter, that even your

12    son said now he realizes that somebody could under the right

13    circumstances do the same thing to her, and that that's the

14    last thing he wants to happen.  That's what I don't

15    understand.

16         But it makes pretty poignant why this is such a

17    serious crime, because we want nobody's daughter, regardless

18    of their circumstances, regardless of their vulnerabilities,

19    to be ever taken advantage of by somebody in a situation

20    where they are trafficked -- that's the word we use today --

21    to make commercial sex profits off their activities doing

22    something that they really don't want to do.  And that's why

23    these are hard cases.

24         But, man, there is just so much of this, it has to

25    end somewhere.  And if we let people just leave after having

```
 1    done this to young girls, the cost would be too low and we
 2    would have a lot more of it.
 3           And I know how hard this is for you to come and
 4    speak.  You have given me a lot of insight.  And thinking he
 5    was calling you momma, I know the affection between you two.
 6    I hope you will continue to stay in his life and support him
 7    while he's away.
 8           Because some day he will leave prison, he will be
 9    back in your arms, you will be around to be able to greet him
10    when he returns, and he will need that.
11           But thank you for being with us.
12           MS. DOROTHY MURRAY:  Thank you.
13           THE COURT:  You are welcome.
14           MR. SECRET:  Your Honor, the only thing that I have
15    remaining is just a statement as to what I think an
16    appropriate sentence should be.
17           THE COURT:  All right.  Let me hear from you, and
18    then I will hear from Ms. Clerk.
19           MR. SECRET:  First of all, Your Honor, let me say
20    that I truly appreciate the Court's sober-minded approach to
21    this case, and all cases, quite frankly.  I just want you to
22    know that I appreciate that.
23           The only argument that I have with respect to
24    sentencing is, of course, one of the things that the Court
25    does is attempt to avoid a disparity in sentences.  And you
```

1    know this case better than me in terms of what sentence was

2    received by Mr. Hill and Mr. King and Mr. Saintvil.

3              I think Mr. Hill received a sentence of 192

4    months.  Mr. King received a sentence of 168 months.  And

5    I would say that while Mr. Murray may be on a level similar

6    to Mr. King, he was, at least I believe in terms of his

7    activity, was less than Mr. Hill.

8              Mr. Murray and I have had a discussion, and

9    Mr. Murray wants me to ask the Court for the minimum

10   mandatory sentence of 120 months.  But I think I would rather

11   ask the Court to do something that I think the Court may be

12   inclined to do, and that is to give him a sentence that is

13   less than Mr. Hill and equal to or greater than that of

14   Mr. King.  That would avoid what I think is a disparity in

15   sentencing.

16             THE COURT:  But the difference is that Mr. King was

17   in one case, Mr. Hill was in another case, Mr. Murray is in

18   both cases.

19             MR. SECRET:  I understand that.  The only thing I

20   can say in response to that, because I kind of anticipated

21   that point, is it is clear from the conduct of Mr. Hill that

22   Mr. Hill was experienced.  I will go so far as to say he was

23   a journeyman at this, trained and recruited Mr. Murray.  And

24   although he -- so the conduct that he had with A.C. and O.M.

25   was not his first rodeo.

1        I think that I can say with some degree of safety

2   that the first case with A.C. and O.M. probably was

3   Mr. Murray's first rodeo and the one with J.B. was the

4   second.

5        So while we talk about I guess the particular facts

6   of the case, it's one thing, but when we talk about what are

7   we protecting our society from in general, I would suggest to

8   the Court that Mr. Hill is still on a little bit of a higher

9   level than Mr. Murray.

10       And again I guess that 170 months, 175 months as

11  opposed to 192 I would ask the Court to consider.

12       MS. CLERK:  Your Honor, while it may be true -- the

13  government doesn't know -- that Mr. Hill may seem to be a bit

14  more experienced than Mr. Murray in the first case, but

15  Mr. Murray, along with Mr. Hill, slept with both of the

16  girls, had sex with both of the girls, and trafficked both of

17  the girls.  He benefited financially from trafficking both of

18  the girls.

19       If Mr. Murray was learning from Mr. Hill, he

20  certainly learned, because several months later he had J.B.

21  working for him, Your Honor, a 16-year-old girl being

22  involved in commercial sex acts.  So he did learn from

23  Mr. Hill, if that was the case.

24       The government is recommending, Your Honor, that

25  Mr. Murray be sentenced to 120 months' imprisonment in

```
1    Case 285, and 120 months' imprisonment in Case 286, and we

2    are asking that the Court would impose the 120 months'

3    sentence in 286 consecutive to Case No. 285, with a total

4    sentence recommendation of 240 months' imprisonment.

5              THE COURT:  I think the guidelines would discourage

6    me from serving the sentences consecutively.

7              MS. CLERK:  That may be true, Your Honor.  I think

8    because there are two different cases, that's the basis for

9    the government's recommendation.

10             THE COURT:  Well, your argument really is you want

11   240 months of incarceration?

12             MS. CLERK:  I'm sorry?

13             THE COURT:  You really want 240 months of

14   incarceration?

15             MS. CLERK:  I'm sorry, I didn't hear.

16             THE COURT:  You are arguing for 240 months.

17             MS. CLERK:  Yes, Your Honor.

18             As the Court knows, this case does involve minor

19   children who were experiencing family and personal hardships

20   at the time they met Mr. Murray.  They were extremely

21   susceptible to manipulation and control, and they were made

22   to do shameful things for money that solely benefited the

23   defendant.

24             Thankfully, Your Honor, several of the girls have

25   gone on to at least finish high school, they are getting
```

1  therapeutic treatment, I think, but for J.B., who is still

2  struggling.  She's having a difficult time.

3          We do believe our recommendation in this case

4  accomplishes the goals set forth in 18 U.S.C. 3553 (a),

5  specifically the recommended sentence takes into account the

6  seriousness of the offense, it justly punishes the defendant,

7  it does protect the public from further crimes of the

8  defendant, and I think it also allows the defendant to avail

9  himself to any of the services offered by the Bureau of

10  Prisons' educational, vocational services, or any medical care

11  that he may need in the future.

12          Your Honor, the government is also asking for

13  restitution.  I believe that Mr. Murray has agreed that a

14  restitution amount be paid which would break down to $500 for

15  O.M., $500 for A.C., and $1,000 for J.B., for a total

16  restitution amount of $2,000.

17          Thank you, Your Honor.

18          THE COURT:  Thank you.

19          Is there a victim witness that you wanted to

20  testify?

21          MS. CLERK:  Yes, Your Honor.  Ms. Pruitt is here

22  and would like to make a statement to the Court.

23          THE COURT:  All right.

24          MS. CLERK:  Your Honor, Ms. Pruitt is the sister of

25  O.M.

1          MS. PRUITT:  Having to be here and listen to these

2     details and to have to listen to someone who did not --

3     sorry, I'm a little frustrated.

4          But listening to Mr. Murray talk, I didn't feel

5     like he was remorseful for what he did to my sister and the

6     other two girls.

7          And it's really sad, because after hearing his mom

8     and his grandmother speak, it does sound like, you know, he

9     was raised to have the mental faculties to make good choices

10    and good decisions.  But he just -- it seems like he just

11    doesn't care.

12         Like he didn't think about his daughter when he was

13    doing what he was doing to my sister and those other two

14    girls.  He didn't think about his mother.  He didn't think

15    about his grandmother.  And it's upsetting for him to try to

16    use that to his advantage today.

17         I feel really bad for his daughter, because now

18    she's losing her dad for some time, and statistically that's

19    not a good thing.  Now she's put in a vulnerable position to

20    where the same thing can happen to her that happened to my

21    sister and the other two young ladies.

22         I feel as if mercy should not be had, because

23    I agree with what you were saying.  You know, people need to

24    know that this is not okay.  People need to think about it

25    and say, you know, wow, I heard about such-and-such, and

1     maybe I shouldn't do this.

2              So I think an example should be made, and it could

3     decrease these activities that are happening.

4              I don't know, you know, what the other two

5     individuals are going through or what their families are

6     dealing with, but I know what my sister is dealing with and I

7     know what my family is going through, and it's something that

8     we are going to have to deal with for a long time, and it's

9     something my sister is going to have to deal with for the

10    rest of her life.

11             So for someone to just say that they've learned a

12    lesson for such a heinous act in such a short amount of time

13    is kind of asinine to me.  I don't see how that's possible.

14             I think he's sorry that he was caught.  After

15    listening to his statement, I feel as though if he had not

16    been caught, there would be more victims and maybe I would

17    not know where my sister is.

18             So that's all I wanted to say.

19             THE COURT:  Thank you very much for being with us

20    to speak.

21             MS. PRUITT:  Thank you.

22             MS. CLERK:  That's all from the government,

23    Your Honor.

24             THE COURT:  Is there anything further that

25    Mr. Murray would like to say?

1        MR. SECRET:  The only thing that I would add,

2   Judge, is I know the Court at times considers the hardships

3   in terms of pretrial prison situations.  He has been in

4   Lovejoy for about a year plus.  We would ask you to consider

5   that in determination of your final decision.

6        THE COURT:  I guess the only good thing to say

7   about that is that he wasn't at the United States

8   penitentiary for that period of time, which is -- I have

9   given some people credit for that.

10       I have said a number of things already, saying how

11  hard this -- a case like this in particular, there are so

12  many dynamics and circumstances that come into play, not all

13  of which I understand.  But I have lived long enough to know

14  that it was a toxic concoction of lives intersecting that

15  resulted in the abuse of what I think ultimately is four

16  young women, although only three of them are really mentioned

17  in the indictment.

18       It is a terrible burden on our community and on our

19  culture and us as a people, whether you are in this country

20  or in any other country, to believe that people can be abused

21  in the manner in which they are being abused too often, too

22  recklessly, too dangerously, and with too long of

23  consequences to everybody.

24       To those sitting in the back that are here to

25  support the defendant, to those that are here on behalf of

1    the victims, the tragedy that results from all of this is

2    overwhelming, distressing, and saddening.

3            There is a group of people in our city, it's a

4    large church, whose sole purpose in holding conferences each

5    year is to raise money for human trafficking, and they are

6    committed to a person to try to find some way to intervene in

7    this process because the criminal justice system hasn't been

8    especially effective.

9            And regrettably, what we are seeing in a case like

10   this is tragic and terrible, but not as tragic and terrible

11   as the busloads of young women that are brought here during

12   major professional sports events, and nothing is done for

13   them.  It's got to stop.

14           One way of doing that is by making the public aware

15   and those that engage in this conduct, that the consequences

16   of this is high, because I do think that that has a deterrent

17   effect.  I just wish it was more acute and pronounced than I

18   have seen it to be.

19           Mr. Murray, you know this is a serious

20   offense.  I think that one of the problems with you

21   expressing yourself is that you are not a real articulate

22   person.  You might be a great rapper.  Maybe if you use that

23   as vehicle, but I think just here, I don't think you do a

24   very good job of communicating.  I understand that, and I've

25   tried to take that into account.

1          But what you have done is serious, and you have

2     ruined the lives of some young women probably forever.

3     Hopefully they will get treatment and be able to overcome

4     this, but talk about profound effects of defendants on

5     people, yours has been profound, and you need to know that,

6     and it's something you will have to live with.

7          The only way that we as a society function well is

8     for people at all levels -- and there is a huge debate

9     beginning and hopefully there's a civil discussion about it

10    is that we need to really respect each other in our

11    country.  We need to do that generally.  We certainly as

12    men need to do that with women, and you didn't.  In fact,

13    you did something that was despicable is probably a fair

14    adjective.

15         The groups like you that get, whether you are

16    improperly influenced by others -- and in some respect

17    I think that in the second case you might have had some

18    improper influence on the people that you were with at that

19    time, including the co-defendant -- that we have got to stop

20    that sort of encouragement, and you need each other to say --

21    somebody has got to say what we are about to do is wrong and

22    let's stop, rather than saying what we are about to do is

23    wrong but it's profitable.  That's got to stop.

24         And I think you need within our system a meaningful

25    skill.  I'm going to suggest to you that there are some

1    people that will be -- that will make their life as

2    entertainers.  I fortunately had a son that started to do

3    that, and he realized how terribly difficult it is, and so he

4    chose for his musical interests to be something that he

5    enjoyed to do, but he needed to make his way in life and care

6    for his family, and so he got trained in something that

7    allows him to do that.

8            You need to be trained in something that will allow

9    you to make a living.  If you want to do things musically --

10   and maybe that will work out for you -- but just as one

11   63-year-old fellow to another, that is highly unlikely.  It

12   doesn't mean it's not important, but you need to set

13   different achievable and realistic goals, and hopefully

14   programs in the prison system will help you do that.

15           This is a hard case.  I have talked -- I have

16   thought a lot about it, and if you will stand, I will

17   announce the sentence I intend to impose.

18           Under the Sentencing Reform Act of 1984, it's my

19   judgment that you, Mr. Murray, be committed to the custody of

20   the Bureau of Prisons to be imprisoned for a term of 215

21   months as to Count Three of Case No. 12-285, and 172 months

22   as to Count One of Case No. 12-286, and those sentences will

23   be served concurrently, and specifically the sentence in the

24   286 case will be served concurrently with the sentence in the

25   285 case, for a total sentence of 215 months.

1        I'm further ordering that you shall pay the

2  United States a special assessment of $200, and that's due

3  immediately.

4        You don't have the ability according to my findings

5  to pay a fine or the cost of incarceration, and I'm not

6  imposing those.

7        You will make restitution to the victims in the

8  total amount of $2,000 to be paid as follows:  $500 to O.M.,

9  and that will be an obligation that's joint and several with

10  co-defendants Mr. Hill and Mr. Saintvil, and that's in the

11  285 case; to A.C. $500, and that's also a joint and several

12  liability that you have with your co-defendants Mr. Hill and

13  Mr. Saintvil also in the 285 case; and $1,000 to J.B., which

14  is a joint and several liability that you have with Mr. King

15  and Mr. Branch in the 286 case.

16        Restitution is due and payable immediately.  I know

17  that isn't likely that you will be able to do that.

18  Therefore, I am going to require that you make restitution

19  payments from any wages that you may earn in prison in

20  accordance with the Bureau of Prisons Financial

21  Responsibility Program.

22        If restitution isn't paid in full at the time of

23  your release, payment is going to be a condition of your

24  supervised release to be paid at a monthly rate of at least

25  $150 plus 25 percent of your gross income in excess of $2,300

1  per month.

2        You are required to notify the United States

3  Attorney's Office in this district within thirty days of any

4  change in your mailing or residence address that occurs while

5  any portion of the restitution remains unpaid.  That's

6  especially true during the course of your supervised

7  release.

8        When you are released from incarceration, you will

9  be placed on supervised release for five years on each count

10  to run concurrently.  And within 72 hours of your release

11  from custody, you will report in person to the probation

12  office in the district into which you were released.

13        While on supervised release, you shall not commit

14  another federal, state or local crime, and you will comply

15  with the standard conditions that we have endorsed as a

16  court, and you will comply with the following additional

17  conditions.

18        First, you will submit to one drug urinalysis

19  within fifteen days after being placed on supervision, and at

20  least two tests after that as your probation officer tells

21  you.

22        And under federal law that requires mandatory DNA

23  testing for those convicted of federal felony offenses, you

24  will cooperate with your probation officer in the collection

25  of DNA material.

1        You can't own, possess or have under your control

2   any firearm, dangerous weapon or other destructive

3   device.  As a convicted felon if you were to have ownership,

4   possession or control of even a gun, that's a separate crime

5   under the laws of the United States for which you can be

6   prosecuted and punished, and that would be in addition to it

7   being a violation of supervised release.

8        You will submit to a search of your person and any

9   property that you have at the request of your probation

10  officer.

11       And you will participate in a drug/alcohol

12  treatment program under the guidance and supervision of your

13  probation officer.  And if you are able at that time, you

14  will contribute to the cost of that treatment.

15       Because you will have likely a restitution

16  obligation while you are on supervised release, while that is

17  unpaid, you will make a full and complete disclosure of your

18  finances and submit to an audit of financial documents as

19  your probation officer requests.  And you can't incur any new

20  credit or open additional lines of credit without the

21  approval of your probation officer, and that's only if you

22  are in compliance with the installment payment schedule I

23  have set for the payment of restitution.

24       You will also participate in a sex offender

25  treatment program, which may include psychosexual evaluation

1    and other psychological testing.  That also will be under the

2    guidance and supervision of your probation officer.  And

3    again if you are able, you will contribute to the cost of

4    that treatment.

5         And because you are now deemed a convicted sex

6    offender, you will register where you reside, where you are

7    employed, and where you may be a student, and for the initial

8    registration you will also register in the jurisdiction in

9    which you are convicted if the jurisdiction is different from

10   the jurisdiction of your residence.  That's a requirement

11   under federal law.

12        And by my comments already, I have taken into

13   consideration not only your circumstances, the offense and

14   your characteristics, but also the other criteria under

15   3553 (a), and I believe this is the fair and reasonable

16   sentence in this case.

17        Is there any objection from the government?

18        MS. CLERK:  No objection, Your Honor.  Thank you.

19        THE COURT:  Any objection from the defendant?

20        MR. SECRET:  None other than those previously

21   filed, Judge.

22        THE COURT:  Then I hereby impose the sentence

23   I have just announced.

24        And you may be seated.

25        Let me read you your appellate rights,

1   Mr. Murray.

2           Because you pled guilty, you can appeal if you

3   believe -- I'm sorry, are you okay?

4           MR. SECRET:  Yes.

5           THE COURT:  You have pled guilty in this case.

6   Herefore, you can appeal if you believe your guilty plea was

7   either unlawful or involuntary or there was some fundamental

8   defect in the proceedings that was not waived by your plea.

9           Ordinarily in the absence of a plea agreement you

10  could appeal your sentence and your conviction, but as you

11  know in your case you entered into a plea agreement that had

12  a limited waiver of appeal provision.

13          And basically you agreed not to challenge your

14  conviction or your sentence substantially in any way,

15  although there were three exceptions which I told you

16  about.

17          You can appeal your sentence if I imposed a

18  sentence above the government's specific recommendation of

19  120 months' imprisonment in the 285 case and 120 months'

20  imprisonment in the 286 case to run consecutively for a total

21  period of incarceration of 240 months.  Your period of

22  incarceration in the aggregate is significantly less than

23  that, but you can talk to Mr. Secret to see if that gives you

24  a grounds to appeal.

25          You can also appeal if the government appeals.  I

1   don't know if they will, but those are both two matters that

2   you ought to talk to Mr. Secret about to see if you want to

3   appeal or should appeal.

4          If you decide to do that, the process begins with

5   the filing of a notice of appeal, which is a document that

6   states your intention to appeal.  It's fairly easy to

7   prepare, and Mr. Secret will help you do that unless

8   something were to happen and he becomes unavailable to you,

9   in which case if you will let the Clerk of Court know, the

10  Clerk of Court will help you file your notice of appeal.

11         While it's easy to prepare, you have only got

12  fourteen days from the entry on the docket of your case of

13  the judgment and commitment order.  That will happen in the

14  next day or two, and it's once that occurs on the record of

15  your case that the fourteen days to file the notice of appeal

16  begins to run.

17         Do you have any request for location of

18  incarceration, Mr. Secret?

19         MR. SECRET:  Atlanta, Your Honor.

20         THE COURT:  Then I will recommend that you be

21  assigned to an institution in or as close to Atlanta,

22  Georgia, as possible.

23         Any other requests?

24         MR. SECRET:  There was some discussion during the

25  course of the PSR about his drug problem.  I'm not sure with

1    this kind of offense whether or not he would be eligible for

2    the drug program, but if so, we would ask the Court to

3    recommend that.

4              THE COURT:  I don't know that rule in the Bureau of

5    Prisons, but I will put in the J&C that he be promptly

6    evaluated for substance abuse issues, and that the Bureau of

7    Prisons determine which, if any, of the programs would be

8    suitable for whatever treatment evaluation they may make.

9              MR. SECRET:  Thank you, Judge.

10             THE COURT:  You will stay incarcerated probably at

11   Lovejoy until you receive your prison assignment, but you

12   will be in the custody of the United States Marshal Service

13   until then.

14             And to everybody who is here, I appreciate your

15   attendance.  For those that are supporting the defendant,

16   your continued support of him will be critical to whether or

17   not he can leave prison once he has served his time.  If he

18   does well in prison, then that will be reduced, and it could

19   be reduced by up to 15 percent.

20             He will be back to you some day, and how well he

21   does when he comes back to you will directly depend whether

22   you are there, whether you have supported him while he's been

23   gone by staying in touch with him and visiting where that's

24   possible, and certainly by your response to him when he turns

25   out and whatever assistance you can give him when he

1    returns.

2           To Ms. Pruitt, I'm sorry that this has

3    happened.  I hope that the government has cared for you and

4    has provided you the support that your sister and your family

5    may need.  I trust that they have.  If you need more, just

6    tell them what it is and they will see if there are means

7    available and resources available to help you.

8           MS. PRUITT:  Thank you.

9           THE COURT:  Anything else I need to cover before we

10   recess?

11          MS. CLERK:  Nothing, Your Honor.  Thank you.

12          THE COURT:  Mr. Secret?

13          MR. SECRET:  No, Your Honor.

14          THE COURT:  Mr. Murray, I am sorry about this day,

15   but I wish you well.

16          We will be in recess.

17              (Proceedings adjourn at 4:20 p.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES OF AMERICA        :
                                      :
4    NORTHERN DISTRICT OF GEORGIA    :

5

6              I, Nicholas A. Marrone, RMR, CRR, Official Court

     Reporter of the United States District Court for the Northern

7    District of Georgia, do hereby certify that the foregoing 73

8    pages constitute a true transcript of proceedings had before

9    the said Court, held in the city of Atlanta, Georgia, in the

10   matter therein stated.

11             In testimony whereof, I hereunto set my hand on

12   this, the 10th day of June, 2015.

13

14

15

16                         /s/ Nicholas A. Marrone

17                         _____
                           NICHOLAS A. MARRONE, RMR, CRR
18                         Registered Merit Reporter
                           Certified Realtime Reporter
19                         Official Court Reporter
                           Northern District of Georgia
20

21

22

23

24

25