```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF GEORGIA
 2                             ATLANTA DIVISION

 3    UNITED STATES OF AMERICA           )
                                         )
 4                  Plaintiff,           )     CRIMINAL ACTION FILE
                                         )     NO. 1:12-CR-286-WSD-2
 5    v.                                 )
                                         )     ATLANTA, GEORGIA
 6    RICHARD DOUGLAS KING (2)           )
                                         )
 7                  Defendant.           )
      _____)

 8

 9                       TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
10                    UNITED STATES DISTRICT JUDGE

11                       Thursday, July 10, 2014

12

13

14

15    APPEARANCES OF COUNSEL:

16    For the Plaintiff:          OFFICE OF THE U.S. ATTORNEY
                                   (By:  Richard Moultrie)
17
      For the Defendant:          Paul M. Cognac
18

19

20

21

22            Proceedings recorded by mechanical stenography
              and computer-aided transcript produced by
23                    NICHOLAS A. MARRONE, RMR, CRR
                        1714 U. S. Courthouse
24                      75 Spring Street, S.W.
                        Atlanta, GA  30303
25                         (404) 215-1486
```

1                          I N D E X

2          Speakers                              Page

3
           Jennifer Hardimon                      29
4
           Whitney Walker                         35
5
           Jeanita Hardimon                       39
6
           Richard King, III                      43
7

8          Allocution by the Defendant           47

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Thursday Afternoon Session

 2                         July 10, 2014

 3                          2:44 p.m.

 4                         -- -- --

 5               P R O C E E D I N G S

 6                         -- -- --

 7         (In open court:)

 8         THE COURT:  Good afternoon, everybody.  This is the

 9   sentencing in the United States v. Richard King, which is

10   Criminal Action No. 12-286.

11         Would counsel announce their appearances, please?

12         MR. MOULTRIE:  Richard Moultrie for the U.S.

13   Attorney's Office, Your Honor.

14         THE COURT:  Good afternoon.

15         MR. MOULTRIE:  Good afternoon.

16         MR. COGNAC:  Paul Cognac on behalf of Mr. King,

17   Your Honor.

18         THE COURT:  Good afternoon.

19         Good afternoon, Mr. King.

20         DEFENDANT KING:  How are you doing?

21         THE COURT:  Mr. King, there was prepared in your

22   case a document called a presentence report that had a

23   variety of information about you and about the Sentencing

24   Guidelines, the two sections I think we talked about at your

25   plea, as well as some other background information.
```

1        I just wanted to make sure that you received a copy

2   of that?

3        DEFENDANT KING:  Yes, Your Honor.

4        THE COURT:  And have you had a chance to read it

5   and to discuss it with Mr. Cognac?

6        DEFENDANT KING:  Yes, sir.

7        THE COURT:  There are a few objections in the

8   presentence report, and let me address those now.

9        The first -- well, there are two objections, one on

10  page six and one on -- I'm sorry, on page five and on page

11  six that generally address the defendant's objection to any

12  representation that he either assaulted or held his hand over

13  the mouth of the victim while she was being assaulted or that

14  he had threatened her or pointed a firearm with respect to

15  the victim.

16       Those, of course, are important to one of the

17  guideline objections that are made later in the objections

18  that the defendant has made, so this I guess would be the

19  government's opportunity to present evidence to try to prove

20  those statements in the PSR.

21       Does the government intend to do that?

22       MR. MOULTRIE:  No, Your Honor.

23       THE COURT:  All right.  Then I will sustain those

24  objections and I will not consider the matter that is set out

25  in Paragraphs -- I think it was 15 and --

1           MR. COGNAC:  18, I believe.

2           THE COURT:  -- 18.

3           There was a matter in Paragraph 18, Mr. Cognac, to

4    which I didn't really see as part of the objection, which is

5    that he at some time in connection with the activity for

6    which he was found guilty, that he had on his person a

7    firearm.

8           I think the -- I interpreted the objection as that

9    he had not pointed a firearm at the victim or fired shots at

10   her, but there is some reference to him actually having

11   possession of a firearm.

12          It might not be his.  In fact, I think the

13   representation is it belonged to Mr. Murry.

14          But in the absence of an objection, that at some

15   time or times during this offense conduct, that he had a

16   firearm, that I intended to consider that, because I didn't

17   see that as part of the objection.

18          Do you intend it to be?

19          MR. COGNAC:  From my review of the rest of the

20   guidelines calculations and the objections, I don't believe

21   that particular fact would impact --

22          THE COURT:  Well, we are just dealing with facts

23   right now.

24          MR. COGNAC:  I understand that.  I did not object

25   that at some point he may have had a firearm, that's correct.

1        THE COURT:  All right.  Then with my ruling on the

2   objections and the clarification that I just made and

3   Mr. Cognac's acknowledgment that there wasn't an objection to

4   the possession of a firearm during at least some of the

5   offense conduct, then I'm going to adopt the facts set out in

6   the presentence report as my findings of facts as may be

7   supplemented by any additional information that is presented

8   during the course of this proceeding, and, therefore, I will

9   use those facts as they might be supplemented during the

10  sentencing proceeding in determining a reasonable sentence.

11       The next objection is to the two-point enhancement

12  under 2G 1.3 (b) (2) (B) for a two-point increase because

13  there was otherwise -- that the victim was unduly influenced

14  or that the defendant as a participant unduly influenced a

15  minor to engage in prohibited sexual conduct.

16       And I have read the position of the government and

17  the defendant, but I will let you summarize those or discuss

18  anything else you might want to discuss about that guideline

19  increase before I rule on the objection.

20       Anything else?  Since I guess you are objecting,

21  Mr. Cognac, I will let you go first.

22       MR. COGNAC:  Your Honor, I would start out by

23  pointing out that the cases that the government has cited,

24  the appendix cases are unpublished opinions, and pursuant to

25  the Eleventh Circuit Rule 36.2, those can be considered, not

1    as precedent, but as persuasive, and I would point that out

2    in reference to those cases.

3            We do not feel that the undue influence should be

4    applied in this particular case.  And the cases that I cited

5    to in my sentencing memorandum, specifically the *Patterson*

6    decision in the Seventh Circuit and the *Myers* decision in the

7    Eighth Circuit, in that what we have here, what you are

8    required to look at under the guidelines is the specific

9    facts to determine if a participant exercised undue influence

10   that changed the pattern or the behavior or somehow

11   influenced the voluntariness of the victim's -- in this case

12   J.B.'s -- participation.

13           Our position is that it didn't.  And in citing to

14   those two cases, specifically the *Myers* decision which

15   indicates if there is a predisposition on behalf of the

16   victim, then that has an impact on whether there is undue

17   influence, because you are not changing their behavior, you

18   are not affecting their voluntariness.

19           And the facts in this case are that our victim,

20   J.B., was engaged in prostitution prior to coming to Georgia,

21   in Philadelphia.  She was engaged in prostitution with an

22   individual named Blue once she came to Georgia.

23           Subsequent to that, she came in contact with my

24   client and Mr. Murry where she engaged in prostitution.  Once

25   she left contact with those two gentlemen, there was another

1    individual by the name of Dutch where she engaged in further

2    acts of prostitution.

3              After she met with the police and was taken into

4    custody and went back to New York, subsequent to, she was

5    found in New Jersey where she was again engaging in acts of

6    prostitution.

7              And our argument is that there is some element of

8    voluntariness in her participation based on the prior and

9    subsequent activity.

10             And based on the fact that she had contact while

11   she was in Georgia, she went to the hospital for a scrape on

12   her leg, she did not at any point outcry to -- this is after

13   she left Blue, she jumped out of the car and came in contact

14   with Mr. Murry.  Mr. Murry took her to the hospital.  She

15   gave a false name, didn't give any information about being

16   forced into prostitution or being required to be a

17   prostitute.

18             Additionally, while she was in contact with

19   Mr. Murry and Mr. King, there was an allegation that the

20   police were called, and again when given the opportunity to

21   explain to the police what was happening, she gave a false

22   name and did not at any point cry out that she had been

23   forced to engage in acts of prostitution, that she was being

24   coerced in any way to do this.  She gave a false name, and

25   then after that continued to participate in this activity.

1    The government cites to the specific language that

2  a participant has undue influence and cites to the superior

3  resources of Mr. Murry and Mr. King.  And there are

4  specific -- the specific things that they point to are the

5  purchasing of clothing by Mr. Murry, the harboring of her in

6  the hotel room, and there are other things that have to do

7  with that activity.  And I understand that it's a

8  participant, which means anybody involved.

9    Mr. King asserts that the amount -- the money that

10  was received from J.B. went to Mr. Murry.  Mr. King fully

11  admits that he was involved in harboring her in that he was

12  working in this with a girlfriend of his, Marteka Marten,

13  who was of age and engaging in this, and they would share

14  rooms or sometimes adjoining rooms that would be under

15  Marteka Marten's name, and that J.B. and/or Murray sometimes

16  would be in the same room or in the adjoining room, and he

17  was involved in harboring her.

18    But none of the acts that he committed or really

19  the acts of Mr. Murry according to *Patterson* and *Myers*

20  changed the behavior or altered the behavior of the victim,

21  and because they didn't change or alter the behavior of the

22  victim, they did not exercise undue influence.

23    THE COURT:  All right.  I will hear from

24  Mr. Moultrie.

25    MR. MOULTRIE:  Your Honor, most of the examples

1    that Mr. Cognac provided in terms of the lack of any evidence

2    that the victim made a prior outcry before she was

3    discovered, the fact that the victim had engaged in

4    prostitution previously, the fact that she had gone to the

5    hospital and received medical treatment and did not make an

6    outcry at that time, those are the kinds of facts that almost

7    always are present in child sex trafficking cases.  Those

8    facts by themselves don't distinguish this case from the

9    myriad cases not only that this Court has --

10              THE COURT:  No, I disagree with that.  I mean,

11   I haven't had -- I would say that it's mixed, maybe 50/50,

12   sometimes they are present, sometimes they are not.

13              And that's why I think that the commission and the

14   guidelines say this is a particularly fact-intensive

15   case-by-case evaluation.

16              MR. MOULTRIE:  Yes.

17              THE COURT:  And it's always hard I will say when

18   I never heard from the victim as to what her side of the

19   story is --

20              MR. MOULTRIE:  Yes.

21              THE COURT:  -- which is not always the case.  I

22   have a lot of victims whose testimony is very compelling,

23   where little things on paper become big things when you

24   listen to a victim.

25              So I'm a little bit hamstrung as a result of that.

1    MR. MOULTRIE:  I agree, Your Honor, and

2  I understand.

3    But acknowledging that, Your Honor, I would urge

4  the Court to consider the full spectrum of facts that the

5  Court does have before it, even though they are just facts on

6  a page, I agree, and it doesn't give the full weight of the

7  emotion and the full picture of what the child experienced.

8    But what we do know, Judge, and what Mr. King does

9  not dispute is that J.B. is alone when she arrives in

10  Atlanta.  The reason why she even comes across Murry and

11  Mr. King is because she's escaping another violent male.  She

12  jumps out of a moving car.

13    She doesn't have any resources, she's alone.  She's

14  the only child with this group of adults.  Mr. Murry, who is

15  approximately -- who is at least ten years older than she,

16  Mr. King, who while not at least ten years older than J.B.

17  enough to trigger the rebuttable presumption under the

18  guideline, is nine years older than J.B.

19    Marteka Marten is also an adult.  Mr. Branch, who

20  is the driver, is also an adult.  J.B. is the one child that

21  is with this group of adults.  They keep her at the Ramada

22  Inn.  When she leaves the Ramada Inn --

23    THE COURT:  Well, there is nothing that says they

24  kept her at the Ramada Inn.  There are facts presented to me

25  that that's where she was.

1          But it's those little -- even on the facts that are

2    in the presentence report, it's those sort of nuances that

3    are missing --

4          MR. MOULTRIE:  Yes.

5          THE COURT:  -- where, you know, it's one thing to

6    say that the activity occurred at the Ramada Inn.  It's got

7    to occur somewhere.  Somebody has got to pay for that; she

8    obviously was not paying for it.

9          But to what extent did she feel -- and that's what

10   is devoid in the facts that are set out is did she feel that

11   she had to stay there, did she feel that she had no option.

12         And what's odd about this case too is that, of

13   course, I have looked at a lot of -- I have seen things in

14   the case through the evidentiary motions -- is that there is

15   this kind of mixed bag about why was she doing what she was

16   doing.

17         On the one hand you could say she was brought down

18   here by this fellow Blue from New York and that she saw

19   Mr. King and Mr. Murry as a safe haven, and therefore might

20   have been -- grateful is not the right word, but might have

21   seen that as a way to escape a situation that she didn't want

22   to be in for one that was preferable, as opposed to what she

23   might say is they are all awful, but this was the one that

24   where there was less intimidation and influence on me than

25   there was in the former one.

1          It's just hard to kind of make a -- it's hard for

2    me to make a final call on this because it's so plainly

3    stated in the facts in the presentence report.

4          MR. MOULTRIE:  Uh-huh.

5          THE COURT:  And I can't fix that.

6          And I understand why you've made the election that

7    you have made, and I might have made the same one.  But it

8    just makes it harder on a paper record on a fact-intensive

9    evaluation to see whether or not it tips in favor of the

10   application of the enhancement.

11         MR. MOULTRIE:  Yes.  And again, Your Honor,

12   I appreciate that and I understand it.

13         The way that the enhancement is written obviously

14   is, as you pointed out, Your Honor, with a direction that the

15   Court closely examine the issue of voluntariness.  But after

16   all, Your Honor, the issue of voluntariness is an issue that

17   is determined based on the facts of the particular case --

18         THE COURT:  Right.

19         MR. MOULTRIE:  -- not what other behavior the

20   victim engaged in when she wasn't with the defendants.

21         And I think, Your Honor, there is a public policy,

22   an important public policy that undergirds that

23   requirement.  I think it's similar to the rule under Rule 412

24   which says that you are not allowed to use a victim's other

25   sexual history in order to show that she consented to engage

1    in sexual trafficking.  I think the same principle applies

2    here, and that is that the Court is expected to make whatever

3    call it does, but based on the facts of the particular case

4    before it.

5            And in this case, Your Honor, I will leave the

6    Court with what I think are the most -- the primary points,

7    and that is that she is with these individuals who have the

8    resources available to them that are not available to J.B.

9            THE COURT:  I know, but -- that's true.  I agree

10   with that.

11           MR. MOULTRIE:  Because, Your Honor --

12           THE COURT:  But that doesn't mean that she couldn't

13   have chosen to say -- I mean, I think the choice is do I stay

14   here where there are some resources -- because it's undue

15   influence; it's not just influence.

16           MR. MOULTRIE:  Sure.

17           THE COURT:  I'm influenced to stay here because,

18   you know, I do need these things, I like the money, I'm

19   getting half of what is produced from my conduct.

20           But I think what the guideline requires is you hold

21   somebody to a greater exposure under the guidelines where the

22   undue -- and I think the definition of undue is in the

23   guidelines, which is it has to compromise the voluntariness

24   of the minor's behavior.

25           And there are things that might have influenced her

```
1    decision-making, but is there enough to show that what they

2    did compromised her voluntariness.  And I read compromise,

3    although it's not defined in the application note, as

4    removing her ability to act voluntarily.

5            And to me it's just a really close call.

6            MR. MOULTRIE:  Yes.  The only other factor I would

7    ask you to consider, Your Honor, understanding that it's a

8    close call as the Court points out, is keep in mind,

9    Your Honor, that when she does leave the Ramada Inn, she's

10   leaving because Branch is transporting her to other locations

11   to engage in prostitution for the defendants.

12           So even when she is -- during the time she's with

13   them, even when she is moving, she is moving because she is

14   being moved by the defendants.  They take her from the

15   Ramada Inn to Fulton Industrial Boulevard, they pick her up

16   from Fulton Industrial Boulevard and they bring her back to

17   the Ramada Inn, and essentially eventually she escapes them.

18           THE COURT:  But aren't the facts of this -- you

19   know, most prostitution cases I think I've had, whatever

20   money is obtained goes to the pimp, and then the pimp sort of

21   selfishly and stingely doles it out so that there is really

22   not ever enough capacity for somebody to leave voluntarily.

23           I think the facts here was there was a sharing

24   arrangement, that it was 50/50, you get 50 I guess for the

25   services that were provided of procuring people, but you
```

1  performed the services, and so you get compensated for them

2  as well.

3          MR. MOULTRIE:  Mr. King and Mr. Murry were sharing

4  the proceeds and then paying Mr. Branch.

5          THE COURT:  And so she -- so what did she get?

6          MR. MOULTRIE:  She had to give all her money to

7  Mr. Murry.  And I don't think that's disputed.

8          THE COURT:  And where is that?  I might have missed

9  that.  Where is that in the PSR?

10          MR. MOULTRIE:  Your Honor, if you look at

11  Paragraph 18 at the very bottom.

12          THE COURT:  There is a lot of 18 I can't consider,

13  though.

14          MR. MOULTRIE:  Oh, okay.  Right above objection by

15  defendant, Your Honor.

16          THE COURT:  It's the second to the last sentence?

17          MR. MOULTRIE:  Yes, sir.

18          THE COURT:  That Murry and King split the money

19  earned by J.B.

20          And that was not objected to?

21          MR. MOULTRIE:  I thought there was also another

22  reference, Your Honor, and I'm not seeing that.  So I may be

23  mistaken about there being a second reference to that point.

24          THE COURT:  Becky, was there a second reference on

25  that issue?

```
1              THE PROBATION OFFICER:  I'm checking quickly.
2              MR. MOULTRIE:  And I think, Your Honor, part of
3     Mr. King's objection is that Murry was getting the lion's
4     share of the proceeds, not him.  But I don't think that
5     that's a --
6              THE COURT:  Well, it does say that they split it
7     evenly.
8              MR. MOULTRIE:  Yeah.  Well, what I was going to
9     say, Your Honor, is I also don't think that that's a valid
10    basis for challenging the application of the enhancement.
11             Your Honor, I don't think there -- I do not think
12    there is another reference.  I think that is the only
13    one.  I think I am probably thinking about the other
14    case.  But that is the reference I was referring to,
15    Your Honor.
16             And for all those reasons, I urge the Court to
17    apply the enhancement.
18             THE COURT:  Well, Mr. Cognac, with that fact, and
19    the fact that she was -- that we know, because I believe it
20    to be true and there hasn't been an objection to it, is that
21    he did, in fact, carry a firearm from time to time, that if,
22    in fact, a young girl who is being offered through Mr. Murry
23    and Mr. King was not provided with financial resources to
24    leave, and, in fact, if she had said something, maybe when
25    she was treated, that she might be denied the meager is what
```

1    I would probably say support that she was receiving from

2    Mr. King and Mr. Murry, that does tend to take away from the

3    volition that somebody has to say I have got to get myself

4    out of this.

5              MR. COGNAC:  Well, Your Honor, although I did not

6    object to him at some point possessing a firearm during this

7    conduct, that doesn't mean that I agree that he ever showed

8    it to her, flashed it to her, said anything about it to

9    her.  Just that he may have had it.  So I don't --

10             THE COURT:  Well, isn't there -- there is -- while

11   I agree and I sustained your objection as to not threatening

12   her with a firearm, there is some reference in here that she

13   saw that he had pointed a firearm at somebody else; isn't

14   that right?

15             MR. COGNAC:  Well, we don't agree that that ever

16   occurred.

17             THE COURT:  Well, but he --

18             MR. COGNAC:  And with regard -- our point is that

19   her voluntariness was not overcome, and that is evidenced by

20   the fact that when she was given the opportunity at the

21   hospital and with the police to cry out and say that this is

22   happening to me, please help me, she chose not to.

23             And she chose to go with Mr. Murry after she left

24   the hospital, she chose to stay with them after they were

25   contacted by police, and she gave a false name and continued

1    to work with them after this allegedly happened.

2           So we think that that goes to her voluntariness and

3    that the undue influence increase should not be applied.

4           THE COURT:  Mr. Moultrie, I just don't think I can

5    get over the line since it is your burden to prove by the

6    preponderance of the evidence.

7           I think there was influence.  I can't get to the

8    point of saying that it has been proved by a preponderance

9    that it was undue influence, and for that reason I'm going to

10   sustain the objection.

11          The next is the objection to the computer

12   enhancement.

13          Well, I guess there was an objection, then there

14   wasn't an objection.  I know that the defendant objects to

15   it, and then I understand that the probation officer changed

16   her mind.  But then I read the memorandum -- and I forgot to

17   compare the date of the government's memorandum arguing in

18   favor of the enhancement, whether that was after the change

19   was made or not.

20          So maybe I should just ask you what's your position

21   on that enhancement?

22          MR. MOULTRIE:  Your Honor, our position is that it

23   should apply.  It's going to be another close call, but it

24   should apply.

25          THE COURT:  I don't find this one quite as close.

1          MR. MOULTRIE:  Okay.

2          MR. COGNAC:  Your Honor, we agree with the

3    probation officer that the application note holds that it --

4    specifically, Application Note 4 --

5          THE COURT:  Well, let's go back and read the

6    enhancement itself, though.

7          It says if the offense involved the use of a

8    computer to, (A) -- there are two things that it could be

9    used for because it's in the disjunctive -- to either

10   persuade, induce, entice, coerce or facilitate the travel of

11   the minor to engage in prohibited sexual conduct, or if the

12   computer was used to entice, encourage, offer or solicit a

13   person to engage in prohibited sexual conduct with the minor,

14   not by the minor, increase by two levels.

15         So if a computer is used to entice, encourage,

16   offer or solicit a person to engage in prohibited acts with

17   the minor or the victim in this case, then this does apply.

18         I think it's interesting that the application note

19   doesn't distinguish between those two subsections, but it

20   speaks in terms of travel.  And if there is anything that is

21   I think inspecific about this particular enhancement, it is

22   the application note.

23         And I think the application note was looking only

24   at subsection (a) because of the example that it gives,

25   because at the very end of it it says the enhancement in

1    subsection (b)(3) would not apply to the use of a computer
2    to obtain airline tickets.
3              So to me I read the application note as discussing
4    directly communicating with a minor or person in connection
5    with their travel to engage in prohibited sexual conduct, and
6    the application note does not intend to apply to both.
7              Because the second -- because there is nothing in
8    subsection (b) that requires travel.  It simply requires the
9    use of a computer to offer a minor's services in prohibited
10   sexual conduct, which is what the defendants did by posting
11   on Back Page the services of the victim.
12             MR. COGNAC:  I am just going on the plain reading
13   of the application note is --
14             THE COURT:  Well, I know that.
15             MR. COGNAC:  -- subsection (b)(3) does not
16   apply.  It doesn't say -- it says does not apply unless the
17   minor or someone in control of the minor is directly
18   contacted by computer.
19             THE COURT:  I understand that.
20             MR. COGNAC:  We don't have those facts.
21             THE COURT:  I understand that.  I think, if
22   anything, this was sloppy drafting of the application note.
23             The plain language of the enhancement itself deals
24   with two situations.  The application note deals with
25   subsection (a), not subsection (b), and so I'm going to

1    overrule that objection.

2            MR. COGNAC:  Just for the record, Your Honor,

3    I would note that the Eleventh Circuit in the case cited by

4    the government, *Madkins,* again an unpublished decision, noted

5    that there might be a conflict, but chose to rule on

6    different grounds.

7            And I would cite to the same case, the *Patterson*

8    case that I cited for undue influence, that is a

9    Seventh Circuit case, and they, confronted with the same

10   situation, ruled that the application note ruled and not the

11   guideline -- underlying guideline application.

12           THE COURT:  Well, my interpretation of the

13   guidelines are that the application notes are helpful

14   information to decide how to interpret the actual

15   enhancement.  I think it's the enhancement that's operative,

16   and that's what I have to interpret.

17           Because if that was the case, if there was an

18   application note that was totally wrong and totally in error,

19   I would never say, well, it's an application note and,

20   therefore, I'm going to read out an enhancement because the

21   application note addresses it in an improper way.

22           So I still overrule the objection.

23           MR. COGNAC:  Not that this would change the ruling,

24   but for the record, my client -- I know it says a

25   participant.  My client indicates that he was not involved in

1   putting these ads out.  That was his girlfriend at the

2   direction of Mr. Murry.

3        But I understand that it's participant and not

4   defendant.

5        THE COURT:  And I think there is a reasonable

6   inference that can be drawn that as the -- because of the

7   relationship between Mr. King and the girlfriend, that

8   I think that it's reasonable to infer that he was to some

9   extent involved in that and, therefore, was a participant.

10        So with that I find that the -- I don't think there

11   are any other guideline objections, are there?

12        MR. MOULTRIE:  No, Your Honor.

13        THE COURT:  Then I find that the defendant's total

14   offense level is 34 -- I'm sorry, 32.

15        MR. MOULTRIE:  31, Your Honor.

16        THE COURT:  I'm sorry, because I haven't taken

17   acceptance of responsibility, excuse me.  31 after

18   acceptance.

19        His criminal history category is five, and that his

20   custody guideline range is 168 to 210 months, and his fine

21   guideline range is $15,000 to $150,000, and that there is a

22   120-month mandatory minimum.

23        Are there any objections to those rulings based

24   upon my interpretation and rulings on the objections?

25        MR. MOULTRIE:  No, Your Honor.

1        MR. COGNAC:  No, Your Honor.

2        THE COURT:  All right.  Then let's go on to the

3   next phase of the sentencing, which would be whatever you

4   want to, Mr. Cognac, present in extenuation or mitigation.

5   We do that first.

6        MR. COGNAC:  Yes, Your Honor.

7        THE COURT:  Then I would like to hear from you and

8   Mr. Moultrie on what you think might be a reasonable sentence

9   from your perspectives, and the last person I would like to

10  hear from is Mr. King.

11       MR. COGNAC:  Your Honor, I would start with the

12  government's recommendation.  The guideline range, bottom of

13  the range is 168 months, the top of the range is 210

14  months.

15       The government pursuant to the plea agreement

16  agreed to recommend a sentence of 180 months, and that is

17  with having the resources to investigate this case, to decide

18  what to charge, to interview the witnesses, to talk with them

19  and see what they thought they could prove at trial and what

20  they thought would be a reasonable sentence after the plea,

21  and that is taking into effect not having disparate

22  sentences.

23       It's my understanding -- and the government would

24  confirm -- that they are going to be recommending a 20-year

25  sentence for Mr. Murry, a five-year sentence for Mr. Branch,

1   and in a related case, I believe Mr. Saintvil is going to

2   be -- they are going to be recommending seven years, and for

3   Mr. Hill they are going to be recommending fifteen years, 180

4   months.

5            My client fully acknowledges his involvement and

6   participation in this.  Although we did not make an objection

7   as far as role in the offense, because I don't think it would

8   qualify, but when we look at how it played out and we look at

9   what the government is recommending, it's clear that

10  Mr. Murry was the head of what was happening with J.B.

11           And although my client was involved, and he

12  acknowledges that, he was not the one who was primarily

13  responsible for what happened to J.B. and the activities that

14  she participated in.  That was Mr. Murry.  My client doesn't

15  deny that he was involved, but he was not the primary

16  motivator of what was happening.

17           He was by his own admission engaged in similar

18  conduct with his girlfriend, who was of age, and they were

19  involved in that activity, rightfully or wrongfully.  But

20  that's how when Mr. Murry -- it was somewhat easier to be

21  involved with J.B. because he was involved with his

22  girlfriend, who was of age.

23           And my client would tell you he didn't know exactly

24  how old J.B. was, but he admits that he acted in reckless

25  disregard of her true age.

1    And, you know, he grew up -- and this doesn't

2  change anything, because there are many people who grow up

3  with similar things, but they are things I want the Court to

4  consider.

5    He has a large family presence here today.  His

6  mother and uncle, cousins, the mother of his child, his

7  father has come here today, friends of the family.  All these

8  people come here and support him.

9    And I did submit a letter from his pastor that

10  I hope the Court would consider.

11    THE COURT:  I got that.

12    MR. COGNAC:  But he does have some criminal

13  history, and he understands that he's going to get a

14  significant sentence.

15    Based on all the factors of 3553 (a), we are

16  requesting a sentence of 140 months.

17    We are additionally requesting -- because he came

18  here on a writ from Cobb County, he's not officially in

19  federal custody.  He's been here since September of 2012,

20  September 5th, some 22 months and five days.  He will not get

21  credit for that time that he has served while here because we

22  have borrowed him from the state unless the Court --

23    THE COURT:  And the state offense is this offense

24  or was it something else?

25    MR. COGNAC:  No, it's something else.  He will not

get credit for any of the time that he has served since he's

been here from September 5th of 2012 unless whatever the

Court imposes is reduced by that 22-month period.

THE COURT:  Well, if he would have been in state

custody on a totally separate state offense -- normally

I would give credit if he was held in state custody because

it was related or intermingled with the offense for

conviction in this Court.  I often give credit for that.

But he would have been in state custody but if he

hadn't been prosecuted for this separate federal offense.

MR. COGNAC:  I would agree with that other than we

don't know how that state proceeding would have progressed,

if it would have been resolved, if it would have been

dismissed, if it was a trial, and it could not proceed

because we borrowed him some 22 months ago, that those --

THE COURT:  Those charges haven't been dropped,

have they?

MR. COGNAC:  They haven't.

THE COURT:  And what are the charges?

MR. COGNAC:  I believe it's possession of a

firearm.  It's in the presentence report.  It's listed --

THE PROBATION OFFICER:  Paragraph 47.

MR. COGNAC:  Yes, Paragraph 47.

He was arrested on July 5th of 2012 for possession

of a firearm by a convicted felon, obstruction, and

1    discharging --

2            THE COURT:  Discharge and aggravated assault,

3    marijuana possession?

4            MR. COGNAC:  Yes.

5            THE COURT:  Okay.

6            MR. COGNAC:  My client does wish to address the

7    Court, and I do have three family members who would like to

8    address the Court.

9            THE COURT:  Let's have the family members first.

10           MR. COGNAC:  Just for the math, if the Court was to

11   impose the 140-month sentence and give the credit, it would

12   actually put him at 118 months.  The Court has to give him at

13   least 120.

14           THE COURT:  Right.

15           MR. COGNAC:  So we would request that it be 120.

16           Also pursuant to the presentence report, it does

17   indicate that my client has a problem with marijuana, and we

18   would ask for the intensive drug treatment program, and also

19   ask that he be housed as close to Atlanta as possible.  I am

20   going to ask the Court to make those recommendations.

21           THE COURT:  All right.

22           MR. COGNAC:  All right.  The first witness we have

23   is Jennifer Hardimon, Mr. King's mother.

24           Ms. Hardimon, if you would spell your name for the

25   court reporter?

1          MS. JENNIFER HARDIMON:  J-e-n-n-i-f-e-r, Hardimon,

2  H-a-r-d-i-m-o-n.

3          THE COURT:  Hi, Ms. Hardimon.

4          MS. JENNIFER HARDIMON:  Hi.  This is very

5  difficult.

6          THE COURT:  I know it is.  I mean, I --

7          MS. JENNIFER HARDIMON:  I just wanted to take a

8  moment.

9          Thank you, first of all, for allowing me the

10  opportunity to share with the Court a different side other

11  than what you see as presented here in the courtroom, another

12  side of my son.

13          He is such a light to our family.  He's loved.

14  He's devoted.  He loves God.  He's loyal.  He's so

15  kind-hearted.

16          I remember when he was younger, when I first signed

17  him up for Little League basketball, he didn't have any clue

18  what he was doing, but the coaches were saying, like, he

19  has -- he's got so much determination.  And by the time he

20  made it to Sprayberry High School, he was the starting point

21  guard.

22          He's deeply loved by us all.  We feel such a void

23  in our lives with this since he's not here.

24          I'm just asking you please for leniency as much as

25  you can for my son, my grandson that's going to be without

1    his father for so long.  And I'm just asking the Court for

2    mercy and leniency.

3            And I have -- I don't know if this is, you know,

4    appropriate or not, but I have pictures of Richard with his

5    son and his siblings that I would like to share with

6    Your Honor.

7            THE COURT:  Thank you.

8            MS. JENNIFER HARDIMON:  He is very active with his

9    son.  He's very active in his church.  He's very close to me,

10   his mother, his father, his siblings.

11           From the time he was born, he's been the joy in my

12   life.

13           And I know that, you know, what he's done is

14   wrong.  He's truly remorseful.  And I just want you to know a

15   different side of him.

16           THE COURT:  You know, I have got a sense of this

17   side of your son, but what it does is it just makes my

18   decision here that much harder.  I don't understand -- and

19   your son is not the first one to come before me that has

20   these two instincts about them.

21           It's like this internal struggle that young men

22   have between good and evil, and I never know whether the

23   reason why they are good is because they know that some of

24   the things they have done are evil and that's a way for

25   compensating for it, or whether they are essentially good but

1    get drawn into conduct that none of us -- I mean, I know you

2    are not -- you don't condone this.

3           You have got young women in your life.  The last

4    thing you would want to happen to them is, even if there was

5    some instinct that they wanted to engage in this sort of

6    sexual activity, that you would say, no, women are to be

7    respected, they are supposed to be treated with dignity, they

8    are never supposed to be put as objects of some man's sexual

9    desire.

10          MS. JENNIFER HARDIMON:  Right.

11          THE COURT:  Yet that's what's here.

12          What makes it really hard for me as I look at this

13   bigger picture is one of the reasons why his guideline range

14   is so high is -- and I told this to your son when I took his

15   plea, I explained the Sentencing Guidelines.

16          And the Sentencing Guidelines look at -- the

17   Commission has looked at each kind of federal crime that can

18   be committed and they have assigned to those crimes a number,

19   and how high that number depends upon how serious they

20   consider the crime to be.

21          Congress and the Commission considers this to be a

22   really significant crime for all the reasons that you and

23   I consider it a significant crime.

24          The other thing that then exposes a particular

25   person to a higher level is how much criminal activity have

1    they had in the past.  And I think it will make sense to you

2    is that the person -- the purpose of a sentence is to deal

3    with somebody who comes here based upon what their history is

4    and what crime they have committed.

5              And if somebody came here without ever having

6    engaged in an offense of any kind in the past, their exposure

7    is lower, much lower.

8              But I would say from one parent to another, that

9    sometimes our kids just don't get it when they get in

10   trouble, and he has had so many encounters with the law.

11             And if you look at his -- at the conduct that he's

12   engaged in, it hasn't gotten better, and we end up here with

13   a really significant, severe crime having fallen -- there are

14   six criminal history categories, he's in five.  There is only

15   one more.

16             And so this will be a significant sentence.

17   I think you can already tell that just from what Mr. Cognac

18   has said, and I think your son recognizes that.  And it's

19   because the pattern here is so compelling that this has

20   become engained as part of his life.

21             So when I talk about the struggle, I have seen so

22   much of it in his criminal history that he needs to recognize

23   that this will be his life forever unless he makes a decision

24   for it not to be anymore.

25             You can't do it.  I personally can't do it.

1  Mr. Cognac can't do it.  Mr. Moultrie can't do it.  None of

2  the family members or friends can do it.  There is only one

3  person that can change the trajectory of his life, and that's

4  your son.

5         And so I have to hold him accountable for what he's

6  done, but in a way I want this -- I want this to be a moment

7  in his life where he makes a choice far different than the

8  choices that he's made in the past, because the past choices

9  have brought him to that chair.

10        And it happens that the last choice he made

11  was something that none of -- nobody in a civilized

12  society ever wants women to be treated, including

13  girlfriends, at some point you say I just will not do

14  that, and Mr. King said, but, yes, I will.  And this is

15  his day of reckoning.

16        So I want you to know this.  I hate this part of my

17  job.  I hate to see young men sitting in that chair facing

18  the sort of repercussions that he will face today.  And the

19  only hope I get and what keeps me going is maybe this is the

20  moment that changes him.

21        But that will only happen if we finally get his

22  attention and his community tells him no more, this is it, we

23  don't want to see you here again, and the best way is giving

24  you some time to think about it, and maybe giving you some

25  skills to come out and do something different than what you

1   were doing to make money.

2           I know it's hard for you.  It will be hard after

3   today.  But the one thing that a lot of people like Mr. King

4   don't have are all of these witnesses to the good part of his

5   life and that support system.  That if he's going to make it

6   well on the other side, it's because everybody back there is

7   still with him.  And the person who is most important is

8   you.

9           And so as hard as it is to forgive him for what

10  he's done, you will have to do that, and you will have to

11  say, I want you back, but I want a different son back.

12  I want us to have a great relationship for a long time

13  without these interruptions that we have had in our

14  relationship.

15          So thank you for coming.

16          MS. JENNIFER HARDIMON:  Thank you.

17          MR. COGNAC:  Whitney Walker, Your Honor.  She is

18  the mother of Mr. King's child.

19          Ms. Walker?

20          THE COURT:  Does Ms. Hardimon want her pictures

21  back?

22          THE CLERK:  I will make sure she gets them.

23          THE COURT:  Thank you.

24          MR. COGNAC:  If you would spell your name for the

25  court reporter, please?

MS. WALKER:  W-h-i-t-n-e-y W-a-l-k-e-r.

I have a five-year-old little boy back there who asks me daily where his father is, and I said his father is at school, and how I wish to God that that was true.

I know Richard has made mistakes.  I know, I have been there.  I have known him since I was 12 years old.

But I don't know that person.  I don't know that person.  Because I understand what you are saying, but it just hurts.  To try to be a mother and a father to my son and also try to break this cycle so that I'm never here with my baby.

In his heart, because he's so good with him, my son adores his dad, and it's so hard to try to -- it's like when he goes to see him, why he can't touch him, why his dad isn't at his soccer game, why his dad doesn't come when he graduates from pre-K.  It's so hard for me.

Just, I don't know, I pray about this every day.  I wish I wasn't here.  I wish none of us were here, but we are.

And I just, you know, ask you to think about my son because, like I said, I don't know that person.  I see it on paper, you know, what he's done, and I just don't know that person.  So it's so hard for me to believe and understand, because I have never seen that person in all the time that I have known him.

```
 1              I mean, we have never fought, so to hear, you know,
 2     anything about him, how he does women, is crazy.  Because he
 3     adores his mother, he adores my mother, my sister.  So this
 4     all just really blew me for a loop.
 5              And I have to be honest, I haven't even come to
 6     terms with this until today.  I haven't cried, because
 7     I don't know -- I don't know that person.  I feel like I was
 8     in a dream and it wasn't real.  I just feel like it is a
 9     dream, like a nightmare, and I just wish I can wake
10     up.  I really do.
11              And I just don't know how I'm going to tell my
12     son.  I'm strong, but I'm not strong enough to be a father to
13     my son too.  I have been through it and I'm trying.  And I'm
14     trying not to break down, because if I break down, I'm going
15     to break down and I'm going to be broken, there is no fixing
16     me.  I don't know how to fix it.
17              This man was my everything, my friend, my
18     confidante, everything, everything.  No matter what they say
19     he did, he still is.
20              So just to hear this, just to sit here, it's so
21     hard.  It's so hard.
22              That's all I have to say.
23              THE COURT:  Ms. Walker, can you stay for one
24     second?  Let me tell you two good things that you can claim
25     in Mr. King.
```

1    The ability for somebody to recover from this, from

2  something like he's engaged in, is an authentic, transparent

3  admission for what they have done.  And I have compared him

4  to other defendants who have sat in that seat.  Even though

5  they plead guilty, there are some people that do that that

6  never come to terms with what they did.

7    The people that do admit what they did and

8  recognize how wrong it is, that there is hope for them.

9    MS. WALKER:  Okay.

10   THE COURT:  That is something that Mr. King I

11  believe has done.

12    The second thing is that even though there are

13  these two Mr. Kings, somewhere in him is the ability to

14  respect others.  He respected you, and I think he respected

15  you enough that he could never let you know what he was doing

16  on the side.

17    Now, if you had known that, you probably would have

18  made sure it didn't happen again.  But he respected you

19  enough and was remorseful enough about what he was doing that

20  he could never admit that to you or to his mother.  So

21  somewhere in there is this ability to care for and respect

22  women and not use them.

23    So that's one thing you can claim is that there is

24  this possibility that he might come back and be the partner

25  that you want him to be.  But I hope that he sees the havoc

that he's wreaked in two of the most important relationships
in his life, and maybe that will help as well.

But I want you to know that I think it's important
for you to grieve about this, I think it's important for you
to acknowledge what's really happened, because it really has
happened.  What he did is, in fact, true.

You will have to decide how you -- whether you are
going to forgive him for that and give him a second
chance.  That's totally something you will have to decide on
your own.

But the one thing I will bet is that you have got
more will and metal than you want to acknowledge, and that
you will in fact stand in the gap for your son.  As much as
you would want him to have a strong male role model in his
life, you are going to have to step into that void for a
while.

And I'm hopeful that there are some men back there
that themselves will serve as good role models, whether it's
in your church or in your community or in your
neighborhood.

But the greatest legacy that Mr. King could play
in his life is some day to sit down with his son and say,
Let me tell you something I did that you should never do,
because the price is too high and the abuse of women is too
great.  But I want you to know that I have been there and I

1    will not let you go the same place that I went.

2              He could do that.

3              MS. WALKER:  Yes.

4              THE COURT:  I hope he does.

5              MS. WALKER:  Thank you.

6              THE COURT:  Thank you for coming.

7              MS. WALKER:  Thank you.

8              MR. COGNAC:  Jeanita Hardimon, Mr. King's sister.

9              If you would spell your name for the court

10   reporter?

11             MS. JEANITA HARDIMON:  J-e-a-n-i-t-a, last name,

12   H-a-r-d-i-m-o-n.

13             So I'm going to give you a different perspective in

14   what I see in all of this.  I have been out of sex

15   trafficking for three years now.  I was rescued.  So when I

16   first heard of what my brother was accused of, I was angry

17   and hurt because I'm thinking he knows, you know, for the

18   most part what I have been through.

19             And, you know, I really started to pray, and

20   I said, God, show me the truth so justice can be served.  Not

21   so he cannot have time or so that my feelings aren't hurt,

22   but for justice.

23             And he said think about the character of the men

24   that took you, and these men were evil.  And when I got my

25   day to stand in court to testify against the men, I took it,

1    because that was a part of me overcoming what I went

2    through.

3           And then I thought about my brother, and I don't

4    see two sides of Richard.  I'm his youngest sister, so I seen

5    him when he was, you know, smoking a joint or, you know,

6    hanging with the wrong crowd.  But I also seen the one who

7    sat me down and told me how beautiful I was and how I was

8    worth something and that a man should treat me right.

9           But I know the side of Richard that needs that

10   connection with other guys, and he got into the wrong crowd,

11   and I honestly feel like his case was being at the wrong

12   place at the wrong time.

13          Because I know my brother and I know what I went

14   through, and I worked with girls in different organizations

15   out here in Atlanta that do outreach on Fulton Industrial,

16   and we go and we talk to these girls, and any opportunity

17   they can to run, they will take it.

18          And now this whole sex trafficking has become such

19   a coercion, when you think these men are your boyfriend and

20   that they love you and all the stuff like that.  But when you

21   realize you are a victim, they take the opportunity to stand

22   up.

23          And I love my brother to death, and now I could say

24   here that I forgive him, because I know his character, the

25   flaws and everything.

```
 1            And I could stand here and say, Oh, I only know
 2    this side of Richard.  I know both sides, and I accept both
 3    of them, because I know he will change, because I changed.
 4    And it's been three years, and I haven't went back.  There
 5    wasn't do this and I am going to go back and go back.  No.
 6            I was taken advantage of, I was a true victim, but
 7    I overcame and I'm a conqueror, and now he will overcome this
 8    and become a conqueror as well.
 9            THE COURT:  You know, I have had a lot of people
10    speak here, but not as powerfully as you have.
11            I've been involved in this business for a long time
12    and have seen the escalation of sex trafficking.  Atlanta
13    regrettably is one of the areas where there is more sex
14    trafficking, more than in the other cities in the
15    United States.
16            And so I have seen people that have been rescued
17    and how broken they are when they get rescued, but I have
18    never really had a chance to see somebody that's overcome
19    their circumstance and to speak as powerfully and
20    passionately and confidently and articulately as you have.
21            But I bet some of that comes from the fact that you
22    are giving back to other women who are coming out of that.
23            MS. JEANITA HARDIMON:  Yes.
24            THE COURT:  And there is something powerful about
25    giving back to others, isn't there?
```

1          MS. JEANITA HARDIMON:  Yes.

2          THE COURT:  I wonder if your brother has it in him,

3    whether when this is all over, he can go into his community

4    to other young men and say I am not going to let you go where

5    I went --

6          MS. JEANITA HARDIMON:  I believe he will.

7          THE COURT:  -- and I want to have an influence so

8    that you don't spend the time that I had to spend locked away

9    from my sister and my girlfriend and the mother of my child

10   and my mom and my friends.

11         And if anybody can lead him in that direction, I

12   believe it's you.

13         Mr. King, you are lucky to have a sister that is

14   modeling this, and I think that she might be the person that

15   is your strongest supporter and somebody to help you the

16   most.

17         Thank you immensely for coming.

18         MS. JEANITA HARDIMON:  Thank you, Your Honor.

19         MR. COGNAC:  Your Honor, would you like to hear

20   from Mr. King now?

21         THE COURT:  I want to hear first from the

22   government, and then I will hear from Mr. King.

23         MR. MOULTRIE:  Your Honor --

24         THE COURT:  One second.  Is there somebody else

25   that --

1          MR. COGNAC:  I did not list his father.  His father

2    is here.  I would ask the Court's indulgence.

3          THE COURT:  I would love to hear from his dad.

4    That would be fine.

5          MR. COGNAC:  Introduce yourself to the Court and

6    spell your name for the court reporter?

7          MR. RICHARD KING, III:  Richard King, R-i-c-h-a-r-d

8    K-i-n-g, III.

9          Good afternoon, Your Honor.

10         THE COURT:  Good afternoon, Mr. King.

11         MR. RICHARD KING, III:  First of all, I would like

12   to apologize to your court for my son.

13         I hadn't talked to him in a while, I hadn't heard

14   from him in a while, but I got a letter from him not long

15   ago, and he's accepting responsibility for his action.  It

16   kind of made me feel better.

17         I know and he knows he's going to be going away for

18   a while, and I'm making a plea, just what his mother said,

19   when you sentence him today, just would you please have a

20   little mercy on his soul.

21         You know, so that's all I want to say.  I wasn't

22   around all the time.  I'm in Memphis, they grew up in

23   Atlanta.  That's no excuse, because we had summers together,

24   communication.

25         But something didn't work out right, and I want to

1    ask for a little mercy for my son, my first born.

2              THE COURT:  Thank you, Mr. King, and thank you for

3    coming.

4              MR. RICHARD KING, III:  Yes, sir.

5              THE COURT:  Mr. Moultrie?

6              MR. MOULTRIE:  Thank you, Your Honor.

7              Your Honor, I just wanted to echo something that

8    the Court said that I thought was particularly impactful,

9    which is speaking from the perspective of an officer of the

10   court, it is very heartening to see this type of family

11   support for Mr. King.  We don't see it as often as Your Honor

12   has pointed out that you would like to see it.  I don't see

13   it as often as I would hope to see it.

14             My role, Your Honor, is to represent the voice of

15   the victim in the courtroom today, who unfortunately not only

16   is not present, but doesn't have a family who is present to

17   provide an emotional component for her story.

18             She was a 16-year-old girl, as the Court knows, who

19   had fled from a fairly -- not fairly, an horrific family

20   environment in New York, and had gone to North Carolina in

21   the hope that she would be able to live with her sister.

22             Her sister, who has maintained contact with the

23   government throughout this process, had hoped to adopt her

24   and had gone through the effort, legal effort of trying to do

25   that, and the officials in New York just wouldn't allow it.

1          So when J.B. came to New York -- Atlanta, excuse

2     me, she was coming to Atlanta, Your Honor, because she did

3     not want to go back to the family environment that she came

4     from in New York.

5          Mr. King and Mr. Murry took advantage of the

6     situation that she was in when they encountered her in

7     Atlanta, and I am -- I want to acknowledge that Mr. King has

8     accepted responsibility for that.  He has placed himself in a

9     position to be held accountable by this Court for that

10    conduct.

11         He spared the government from having to be required

12    to bring this young girl into the courtroom, given all of the

13    problems that she has, which would have been particularly

14    traumatic for her.  And so that is a factor that heavily

15    weighed in the government's decision to recommend the

16    sentence in what I thought would be the middle range of the

17    advisory guidelines, a sentence of 180 months.

18         But, Your Honor, I also want to point out that the

19    gravity of what occurs in these cases where children are

20    trafficked doesn't just involve a physical component, it

21    doesn't just involve physical harm, but in some ways more

22    damaging is the psychological harm that it imposes on

23    children like J.B., and very often it is the psychological

24    harm that is the harm that lasts the longest.

25         And this is a case where, Your Honor, arguably that

1   is going to be particularly true, because J.B. found herself

2   in a situation of being exploited by Mr. King and the other

3   defendants in this case with a lot of other problems that

4   existed as well.

5          So, Your Honor, for all of those reasons -- I'm not

6   going to go over again the factors that are in the PSR about

7   Mr. King's criminal history because the Court has addressed

8   those.  Mr. King has a serious criminal history, as the Court

9   has pointed out.

10         I think, Your Honor, that a substantively

11  reasonable sentence of 180 months is a fair sentence that

12  takes into consideration the seriousness of the crime he

13  committed, but also provides a component of acknowledgment

14  that he has done the right thing by coming into court and

15  accepting responsibility for what he has done.

16         Your Honor, we do not oppose Mr. King receiving the

17  credit for the time that he has served while in federal

18  custody, and we made that point during his change of plea

19  hearing, and so we stand by that.

20         But we would ask the Court to impose a sentence of

21  180 months, and any credit for time that the Court deems is

22  appropriate to provide him for having served.

23         THE COURT:  How long has he been -- how many months

24  has he been --

25         MR. MOULTRIE:  I think it would be 21.

1          MR. COGNAC:  Twenty-two months, Your Honor.

2    September 5th of 2012 he was brought into federal custody.  I

3    believe that would come out to 158 months if it was taken off

4    the 180.

5          MR. MOULTRIE:  Your Honor, I should also point out

6    that Mr. King agreed to a negotiated settlement with the

7    government about restitution, and so it won't even be

8    necessary for the government to litigate that, and I think

9    that's something else to be considered.

10          THE COURT:  All right.  Mr. King?

11          He can either speak from here or he can speak from

12   there, whatever he's most comfortable with.

13          DEFENDANT KING:  How are you doing, Your Honor?

14          THE COURT:  I'm fine, thank you.

15          DEFENDANT KING:  First off, I want to start off,

16   first and foremost, I want to apologize for being in the

17   courtroom.

18          I understand this is your job.  I don't

19   underestimate the burden that's placed on your shoulders as

20   far as the severity of this case or whatnot.

21          And I just want to apologize to the victim in the

22   case.  Like my sister told you, she was a victim of sex

23   trafficking, and like when I found out, she couldn't even

24   tell me, you know.  Because she know how I found out about

25   it, it really stung, like I could have prevented it, you

1    know.

2            So I can only imagine how the victim, the victim's

3    family, how she feels.  I can't imagine what she endured, you

4    know, mentally, emotionally, and how she is still going to

5    handle it.  Just in a family, I can imagine how they feel.

6            I can't fathom just thinking about my sister going

7    through what the victim went through before she even

8    encountered us or why she was with us or after us or

9    whatever.  It just stings.

10            I'm trying -- I'm trying to stand up here strong

11    for -- just how do my sister, because she looked at me like

12    she -- like, you know.  But, Your Honor, I just can't.

13    I understand the severity of the case.  I understand.  I did

14    it, I'm in the wrong.

15            I know there was a lot of questions from my family

16    asking me why am I pleading out, but I had to stress to them

17    that this is my life, you know.  It's my life and I have got

18    to do what's best for me, and of course I have got to do

19    what's best for my son.

20            And I know from the outside looking in it looks

21    like I disregard everything that had to do with my son, I

22    could care less about him because I'm in here and I'm in

23    constant trouble.  But my family, they know me, and my

24    friends, they know me, they now how sincere and know that --

25    they know that Tristen in my life is everything.

1        So for my family, I just want to apologize.  I look

2   around the courtroom, I see people who I have looked up to

3   and people that looked up to me and certain people that I

4   have got total admiration for that expect so much more from

5   me.  I feel like I let them down.

6        But I am going to conquer this.  I know it's not

7   over, you know, and I will just stay strong.

8        I apologize.  I really, genuinely, I'm taking --

9   I'm taking -- I'm taking what I did.  I can't speak what

10  nobody else did.  I know my lawyer mentioned Mr. Murry.

11  I can't speak on him.  I am taking responsibility for what

12  I did, Your Honor.

13       I've always said to my family and friends I never

14  had a problem with owning up to what I have done,

15  Your Honor.  That's why it was so hard for me to plea out to

16  the charges that was put against me, because the majority of

17  it I didn't have nothing to do with.

18       But once they came and explained it, I was totally

19  satisfied with my plea, totally satisfied.  When I realized

20  this is where they were coming, I was like I have to take

21  it.

22       My family -- my family and friends, they looked at

23  me crazy.  Like I said, I had to do what's best for me, my

24  son, and I just -- I just know -- I'm very -- I'm a very

25  genuine person.  And when I tell you that I feel disgusted

1   with myself, Your Honor, knowing that I put a young woman

2   through what I put her through, knowing that I have three

3   little sisters, I have nieces, three nieces, I have multiple

4   female, younger female cousins that if they was in the middle

5   of the ocean, I would swim to them with no thought process

6   left, I would go get them.

7           And for me to throw -- basically sending another

8   female out there just in total disregard of her, her family

9   and, you know, it just -- I know, I understand the severity

10  of my case.  I don't want you to think that I'm not

11  taking -- I'm taking responsibility for what I did.

12          Do I think -- do I think fifteen years is a lot?

13  Yes, I do.  But I understand my record, and my record shows

14  I'm not no -- I'm not that aggressive a person to make these

15  encounters.  I got caught up -- I got caught up in a bad

16  situation.

17          You know, when I first got here, I tried to place

18  blame on other people, until I sat down and realized that

19  I can't put the blame on nobody but myself, you know.  And it

20  just kills me to know the fact that my child's mother, she

21  would tell me, she was like there are certain things you do,

22  it is going to affect my son, you know, and I know it hurts

23  him more than it hurts me.

24          And I just hate the fact that I was naive and

25  stupid to the fact that if I kept doing certain things and

1   hanging around certain people, that it would take me out of

2   his life -- not necessarily take me out of his life, but me

3   missing pivotal points in his life, just like soccer games

4   and questioning when I hear about him, the basketball games,

5   softball games, all that, all that.  Because I always wanted

6   to be that father, to be the -- I'm sports crazy, so growing

7   up I wanted to be there for a sports game, his education.

8           I just -- I understand.  I understand that I messed

9   up, Your Honor.  And I do think fifteen years is steep, but

10  I'm here willing to take the fifteen, if that's what the

11  Court -- I'm willing to take what the Court orders me to

12  do.

13          It's not going to change the outlook I have on this

14  thing.  I understand.  I learned from it.  You know,

15  I learned after seeing my sister, my child's mother, and my

16  mother, who is like my backbone.

17          I mean, like that woman put more -- she like went

18  over and beyond for me and my brothers and sisters, and for

19  me not to be there for my son seeing what my mother had to

20  encounter, she had to overcome certain things, I know it's

21  going to be hard for my child's mother.  And I just -- I just

22  want to get back to them as soon as possible, Your Honor.

23          I understand I'm supposed to go to prison.

24  I deserve to go to prison.  I mean, that's mandatory.

25  I understand that.  But I just ask that you have mercy on

1    me.

2          You know, I'm a God-fearing man, I'm a church-going

3    man.  I got sidetracked.  I went to the wrong things.

4    I got -- if you look at my convictions, they are nothing like

5    this, you know.

6          But, you know, life is about mistakes, it's about

7    how you recover from mistakes also.  And when I get back out

8    there with my son and my family, I'm going to let it be known

9    that -- and it's going to -- Your Honor, they are going to

10   see a changed man, you know.

11         Like you said, I do have two sides.  That's really

12   inevitable.  I mean like, I do have a side that is

13   family-oriented -- you know, I'm always about family -- but

14   I do have I don't want to say a dark side, because I'm not

15   the person that I heard all types of stuff the media

16   portrayed me to be, but I do have a side that's immune to the

17   streets and whatnot.

18         But I just ask that you have mercy on me.  And I

19   can't stress enough the fact I don't want to get around the

20   fact that I did this.

21         And I do -- I do genuinely apologize to that little

22   girl or that woman or however old she might be.

23         I have got three sisters, Your Honor, and if

24   somebody -- if -- when I heard about my sister, she couldn't

25   even tell me -- she couldn't even tell me nothing like that

1    because she know I would -- she was at this halfway house,

2    she was at this transitional center or something to help her

3    cope with what she did in the past.

4           So me and my big brother would pull up out there

5    and she would talk to us and she would tell us like how much

6    she's changed and how much the boy changed and like how much

7    just me and my brother come to see her just helps her and

8    lifts her.

9           And I just want you all to know that you all

10   helped.  Thank you, all.  I will never forget this.  This is

11   the most important day of my life, and I see back there,

12   these people are my backbone.  I just thank you all.  My big

13   brother, these folks that -- these people are my family.

14          And I don't want to leave this podium, man, because

15   I feel like once I leave and I'm sentenced and I go back

16   there, there's no telling when I see all these people behind

17   me again.

18          I just thank you all, and I apologize to you all.

19   I just apologize, sincerely.

20          Like I said, I apologize.  I know this is a hard,

21   hard case, hard situation for you, you know.  My mother

22   getting up here crying, my child's mother getting up here

23   crying.  And I'm sure you have probably seen it before.

24          But I mean, I'm at peace, I'm at peace with the

25   situation.  I'm at peace with whatever is going to happen,

1   you know.  I just ask -- I just ask that you have mercy on

2   me.

3          I thank my lawyer.  We bump heads at times, but he

4   really stood up for me today.

5          I guess that's it.  I just want to thank you.

6          I feel like I'm leaving something out.

7          Again, to the victim, I apologize.  I wish there

8   was something I could do.  I wish she could meet my sister,

9   like literally, because from what I understand, she was going

10  through it after -- like since I have been locked up,

11  I really wish she would meet my sister.

12         That's why I wanted my sister to get up here and

13  speak for me, because I know she's a powerful speaker, I know

14  she moves rooms like when she talks.  She will sit there and

15  talk to me and my big brother about -- about just her all

16  day.  Yeah, yeah, I did this, I did that.  She won't let us

17  get two words out of it.  She rules the room.  I just thank

18  her.

19         But I want to thank my child's mother.  You know

20  I love you to death.

21         I thank my mother.  My mother, she got me crying.

22  She is my everything.

23         I just thank my father for making the trip.  That's

24  my pops, man.

25         Of course, my little brother.

1          MR. RANDON KING:  I love you, man.

2          DEFENDANT KING:  I know you do.

3          I see my cousins I haven't seen in a minute.

4          I just want to thank you for the opportunity to let

5     me speak.  I would be through now.

6          THE COURT:  Thank you, Mr. King.

7          Well, this is a pretty remarkable job I have

8     sometimes.  Every sentencing and every proceeding I have is

9     different, but occasionally something happens that gives me a

10    deep belief that reconciliation is beginning, and I really

11    feel that way about your statement, the statement of your

12    family members to me, and just the way that people have come

13    to rally around you on this, which is going to be a hard day

14    for you and for your family.

15         I'm really taken by your sister.  You know, every

16    now and then you run across somebody who has suffered kind of

17    unthinkable trauma in their life that entitles them to be mad

18    and bitter and vindictive, and she could be all of those

19    things.

20         But if you see it, and I see it, there is a sense

21    of peace about her, despite what's happened, that is

22    remarkable.  The question is whether or not some time from

23    now -- and although I think it might be beginning --

24    whether you and she will be able to sit side by side and say,

25    We have taken -- we have different stories about our

1   lives.  Mine was involuntary, yours was voluntary, but we

2   have both gone through a lot of bad things.

3           But through every dark valley there is a green

4   pasture, and she's in it.  And I think everybody back there

5   hopes that you will join them by putting -- being able to put

6   this behind you, by being forgiven by them and forgiving

7   yourself and to say that I'm going to be a great dad to my

8   son, I'm going to be a great son to my mother and my dad, and

9   I'm going to be a great family member to my family members,

10  and a great friend to my friends.

11          Unfortunately I can't let you do that today,

12  because as much as I am moved by your story and by your

13  support, one of the responsibilities under these -- we all

14  talk about them as 3553 factors, but it really is who are

15  you, what have you done, what's your potential, what's your

16  character, what did you do to the victim in this case, and

17  those are all the sort of -- those are the personal factors

18  which I think are the mercy factors.

19          But you did commit a crime against your community

20  and you committed a crime against a young woman who has had a

21  bad background, and I think I totally understand about her

22  complicity in all of this, but ultimately she was a lot

23  younger than you and she is now going to have to recover and

24  hopefully have the same peace that your sister has.

25          But you have got a role in putting her in a place

1    from which she has to recover, and the community and my role

2    as a representative of the community is to hold you

3    accountable for what you have done, and what I am supposed to

4    do today is to balance those two.

5            I told you that the Sentencing Guidelines promote

6    uniformity in sentencing, and so I know what your guideline

7    range is.  The question for me is where within that range

8    should you be.

9            And where within that range you should be is always

10   one of the things I have to make a judgment is where within

11   the range would give you some sense that there is hope and

12   justice in this system and to encourage you to be different

13   when you come out of all of this than you were when you were

14   in the middle of it.

15           I also know -- and while I haven't always in the

16   past given credit for somebody who is detained -- who would

17   have been detained by state authorities on a different crime,

18   the fact is that you have been in federal custody and you

19   were in federal custody because of this offense, and so I

20   will give you credit for that, which will end up being a

21   sentence that I will tell you was different than I was

22   thinking about when I first came in here, and it's lower.

23           Because sometimes judges say, well, do

24   you really -- are you really impacted by a sentencing

25   proceeding.  I really can't remember a sentencing proceeding

1    where I haven't been impacted, and I come in, have a thought

2    about where I am going to end up, and it's different than

3    where I do end up.

4         But having considered the seriousness of what you

5    have done, the impact on the victim, the need to deter

6    others, including people that took advantage of your sister

7    at some point in your past, that we have got to persuade

8    people, and sometimes we do that by sentences, that it's too

9    costly to engage in the kind of conduct that you and others

10   engage in.

11        And I would like for you to benefit from a good

12   institution that might teach you a good skill so that when

13   you come out, that you will have meaningful work and have a

14   meaningful life and be able to meaningfully provide for your

15   son and for others that are in your life at that time.

16        So having considered the factors under 3553, all of

17   them, if you will stand, I will announce the sentence

18   I intend to impose.

19        Mr. King, under the Sentencing Reform Act of 1984,

20   it's my judgment that you be committed to the custody of the

21   Bureau of Prisons to be imprisoned for a term of 168

22   months.

23        I am going to give you 22 months' credit for the

24   time that you have been in pretrial detention, which means

25   that ultimately you will have to serve -- or you are being

sentenced to a period of 146 months.

I am further ordering that you shall pay to the United States a special assessment of $100, and that's required to be paid immediately.

I find that you don't have the ability to pay a fine or the cost of incarceration, and I'm not going to impose those.

Having agreed to restitution in the amount of $1,000, that shall be paid to the victim in this case, and that is an obligation that you will be responsible for jointly and severally with your co-defendants, Mr. Branch and Mr. Murry.

When you are released from incarceration, you will be placed on supervised release for a term of fifteen years. And within 72 hours of your release from custody, you will report in person to the probation office in the district into which you are released.  And again you have to do that within 72 hours.

While you are on supervised release, you shall not commit another federal crime, state or -- another federal, state or local crime, and you will comply with the standard conditions that we have imposed as a court, and you will also comply with the following additional conditions.

You will submit to one drug urinalysis within fifteen days after being placed on supervision, and at least

1    two tests after that.

2           You will participate in a drug/alcohol treatment

3    program under the guidance and supervision of your probation

4    officer.  And if you are able at that time, you will

5    contribute to the cost of that treatment.

6           And under federal law that requires mandatory DNA

7    testing for those convicted of federal felony offenses, you

8    will cooperate in the collection of DNA as directed by your

9    probation officer.

10          You cannot own, possess or have under your control

11   any firearm, dangerous weapon or other destructive

12   device.  You probably know to do any of those things is a

13   separate crime under the laws of the United States for which

14   you could be prosecuted and punished.

15          With respect to restitution, you will make

16   restitution payments, by the way, from any wages that you may

17   earn in prison in accordance with the Bureau of Prisons

18   Financial Responsibility Program.  And any portion of the

19   restitution that's not paid in full at the time of your

20   release from incarceration shall be a condition of your

21   supervision and be paid at the monthly rate of $150 plus

22   25 percent of any gross income you have in excess of $2,300

23   per month.

24          You may not open any additional lines of credit or

25   incur any credit obligations without the approval of your

United States District Court
Northern District of Georgia

1    probation officer, and you shall submit to an audit of your

2    financial records at the request of your probation officer.

3            You will also participate in a sex offender

4    treatment program, which may include a psychosexual

5    evaluation and other psychological testing and treatment that

6    your probation officer may deem would be helpful to you.  And

7    again if you are capable, you will contribute to the cost of

8    those services.

9            And you will participate in a cognitive skills

10   program under the guidance and supervision of your probation

11   officer.

12           Is he required to register?

13           MR. MOULTRIE:  Yes, Your Honor.

14           THE COURT:  You also will be required to register

15   as a sex offender under the sex offender statute, and failure

16   to do that would also be a violation of your supervised

17   release.

18           So that is the sentence I intend to impose.  Is

19   there any objection from the government?

20           MR. MOULTRIE:  No, Your Honor.

21           THE COURT:  Is there any objection from the

22   defendant?

23           MR. COGNAC:  Just for the record, Your Honor, the

24   objection for the use of the computer, and an objection as

25   being substantively unreasonable under 3553 (a).

1          MR. MOULTRIE:  Your Honor, given the objection that

2    was lodged to the application for use of a computer,

3    I wondered if the Court would be willing to indicate whether

4    it would have imposed the same sentence notwithstanding its

5    ruling on the use of the computer enhancement?

6          THE COURT:  No, I was going to say that I thought

7    long and hard really about what a fair sentence is, and even

8    if I was wrong about the use of the computer enhancement,

9    this is the sentence that I would have imposed even if I

10   hadn't overruled that objection.

11         I believe in my head and in my heart that this is

12   just the right and appropriate and fair sentence for the

13   defendant irrespective of my rulings on the computer

14   enhancement.

15         So with that, I hereby impose the sentence I have

16   just announced.

17         And you may be seated.

18         MR. COGNAC:  Your Honor, I do have the

19   recommendation for the drug program and --

20         THE COURT:  Let me first -- so you all can sit

21   down.

22         There was a limited waiver of appeal provision in

23   this plea agreement, as I recall?

24         MR. MOULTRIE:  There was.

25         THE COURT:  Mr. King, you can appeal -- because you

1   have pled, you can appeal if you believe the guilty plea was

2   either unlawful or involuntary or there was some fundamental

3   defect in the proceedings that was not waived by your plea.

4          In the absence of a plea agreement you would have

5   been able to appeal your sentence, but in your plea agreement

6   you have agreed that you would not challenge either your

7   conviction, which is what happened when I found you guilty of

8   the offense, either by direct appeal or by a collateral

9   attack, which is the separate civil lawsuit I told you about,

10  and you have agreed not to challenge your sentence either by

11  a direct appeal or a collateral attack on your sentence.

12         You have two exceptions to your ability to appeal,

13  and it only applies to an appeal of your sentence in the plea

14  agreement that you have entered into with the government.

15         And specifically you can appeal if I ended up

16  imposing a sentence that's greater than what the guidelines

17  recommend as I determine the guidelines to be.  I believe I

18  have not done that, but you can talk to Mr. Cognac to see

19  whether or not that's one of the exceptions that allows you

20  to appeal.

21         And you could also appeal if I imposed a sentence

22  that was greater than 180 months.  As you know, I have not

23  done that.

24         And you could appeal if the government appeals.  So

25  actually there are three conditions.

1    I don't think any of those have been met, but

2    certainly Mr. Cognac -- and I agree with you, I think he has

3    well represented you and that you have been really served not

4    only by his advocacy but also by his representation of you

5    and his presentations to me.  I hope you appreciate that.

6    I think you do.

7    If you decide to appeal after discussing it with

8    Mr. Cognac, then you begin that process by filing a notice of

9    appeal, which is a simple statement of your intention to

10   appeal.  It's easy to prepare, but it has to be filed within

11   a short time after the entry of the judgment and commitment

12   order, which is the official document that goes in the record

13   of your case imposing the sentence.

14   Once that becomes a matter of record on your docket

15   of the case, you will have fourteen days after that to file

16   the notice of appeal.

17   If for some reason Mr. Cognac is not available, if

18   something were to happen to him, for example, if you let the

19   Clerk of Court know, the Clerk of Court will help you file

20   the notice of appeal.

21   Mr. Cognac, if he elects not to appeal after the

22   fourteen days have run, if you would just note on the record

23   that you have consulted with him about his appellate rights

24   and also in light of his plea agreement and just file

25   something to indicate that he's had that advisement and has

1   elected not to file a notice of appeal, we will then know

2   what his intention is at the end of the fourteen days.

3           MR. COGNAC:  Yes, Your Honor.

4           THE COURT:  So you will stay in the custody of the

5   Marshal's Service until you receive your assignment.

6           I will recommend that you be assigned someplace as

7   close to Atlanta, Georgia, as possible.

8           It is my -- I really am not a therapist so I can't

9   tell you whether or not you would qualify or not qualify for

10   the intensive drug treatment program, but I will recommend

11   that you be promptly evaluated for substance abuse and any

12   other psychological issues that might be present with you,

13   and that if you qualify for the intensive drug treatment

14   program, I'm going to recommend that you be allowed to

15   participate in it.  So those will be part of the judgment and

16   commitment order.

17           I want to thank all your family for being here and

18   your friends for being here.  I especially want to thank

19   those who spoke on your behalf.

20           And I want to thank you for spending as much time

21   looking at them and apologizing to them, because that doesn't

22   often happen.  Sometimes I invite people to do that.  It was

23   I thought a mark of your character that you did that on your

24   own.

25           I believe that there are great days ahead of you,

1   but there is going to be an interruption until you can live

2   those the way that you want, but they will come.  And I wish

3   you well in your future.

4                DEFENDANT KING:  Thank you.

5                THE COURT:  Anything else that we need to do today,

6   Mr. Moultrie?

7                MR. MOULTRIE:  No, Your Honor.

8                THE COURT:  Mr. Cognac?

9                MR. COGNAC:  No, Your Honor.

10               THE COURT:  All right.  We will be in recess.

11                    (Proceedings adjourn at 4:15 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES OF AMERICA        :
                                      :
4    NORTHERN DISTRICT OF GEORGIA     :

5

6            I, Nicholas A. Marrone, RMR, CRR, Official Court

     Reporter of the United States District Court for the Northern

7    District of Georgia, do hereby certify that the foregoing 67

8    pages constitute a true transcript of proceedings had before

9    the said Court, held in the city of Atlanta, Georgia, in the

10   matter therein stated.

11           In testimony whereof, I hereunto set my hand on

12   this, the 19th day of October, 2015.

13

14

15

16                       /s/ Nicholas A. Marrone

17                       _____
                         NICHOLAS A. MARRONE, RMR, CRR
18                       Registered Merit Reporter
                         Certified Realtime Reporter
19                       Official Court Reporter
                         Northern District of Georgia
20

21

22

23

24

25